ROLLIN E. TALBERT, Administrator of Estate of CLYDE LILLARD, v. CHICAGO, ROCK ISLAND & PACIFIC RAILWAY COMPANY, Appellant. —15 S. W. (2d) 762.

Court en Banc, February 11, 1929.

*Luther Burks, Henry S. Conrad, L. E. Durham, Hale Houts* and *Ilus M. Lee* for appellant.

*Rosenberger, McVey & Freet* for respondent.

1084

WHITE, C. J.—Clyde Lillard was killed on the eighth day of January, 1914, while in the service of the defendant company, through the negligence, it is alleged, of the defendant. The action is in two counts, the first for damages accruing to the mother of the deceased, and the second for damages on account of conscious suffering of Lillard after his injury and before his death. On a trial in February, 1927, in the Circuit Court of Jackson County, the plaintiff recovered judgment for $4096.80 on the first count, and for $18,000 on the second count. The trial court required the plaintiff to remit $8000 from the second count as a condition for overruling defendant's motion for rehearing, and the judgment stood on the first count at the sum mentioned, and at $10,000 on the second count. From that judgment the defendant appealed.

Clyde Lillard at the time of his injury was employed by the defendant as a brakeman on a local freight train, which was engaged in interstate commerce. On January 8th that train arrived at the station Walters in Oklahoma. At that point there are three tracks, designated as the main track, the house track, and the passing track,

all running north and south. The passing track was on the west of the main track, and the house track was on the east of the main track and on the opposite side of the station. When they arrived at that point, the crew became engaged in switching cars, which were pulled from the house track onto the main track and then "kicked" down onto the passing track. A car called the ballast car was kicked in that manner down the passing track, to be coupled to cars which stood on that track. Lillard in the performance of his duty was along the track where the ballast car would pass, and when it arrived within from twenty-five to fifty feet of the car to which it would be coupled, he stepped on to the track in front of it. It was moving slowly, about as fast as one could walk. What his purpose was and what he did is a matter of dispute. Before he could step out of the way of the moving car his foot caught in the spongy soil between the rails; he stumbled and fell. The car wheel ran over him and crushed the bones and muscles of his left leg and hip up to the region of the abdomen. The conductor called for help, the car was pushed off the man and a doctor was called. He was placed upon another car, started for the hospital and died in about an hour after the accident.

The plaintiff alleges, as acts of negligence, that the ballast car was not equipped with couplers coupling automatically by impact, and it became necessary for Lillard to go between the ends of the cars to adjust and align the coupling apparatus. It is further alleged that the roadbed between the rails was soft and spongy, and dangerous for a man to walk upon. That the petition sufficiently alleges negligence in those respects is not controverted. The appellant admits that the roadbed between the rails of the track at the point where the injury occurred was unsafe and not in a reasonably good condition for a person to walk on, and that the condition had existed for a sufficient time for defendant to have had it repaired.

It is further admitted that the defendant was engaged in interstate commerce with this train at the time of the injury.

The appellant, however, claims that a case was not made out showing that the coupler with which the ballast car was equipped was defective, or that it was necessary for Lillard to go upon the track for the purpose of aligning it.

I. This case was tried once before and came on appeal to this court, where a judgment for the plaintiff was reversed and the cause remanded. [Talbert v. C., R. I. & P. Ry. Co., 314 Mo. 352.] The petition, on which the first trial was had, alleged as the only act of negligence the defective condition of the track between the rails where Lillard was caused to fall, but in the reply plaintiff alleged negligence in the defective condition of the coupler. The judgment was reversed and the cause remanded on the ground that the plaintiff could not recover on a cause of action stated in the reply, adopting the theory of the

defendant that the defective condition of the track was not the proximate cause of the injury, but the act of Lillard himself in going upon the track where his duty did not require him to go, unless the defective coupler made it necessary. The opinion says (l. c. 368) that the question of negligence in relation to the coupler, under the Safety Appliance Act, could not be considered for the purpose of determining the cause. Since the petition on the last trial contained allegations of negligence, both as to the defective track and the defective coupler, that objection is removed. Appellant apparently concedes that if the coupler was in such condition that it was necessary for Lillard to go in front of the moving car in order to adjust it so as to make a coupling possible, a case was made for the jury.

We cannot pass over that subject without noting some statements in the former opinion. For instance, it was said (p. 368) : ''If we read the Safety Appliance Act into the petition it must be held that the company owed Lillard no duty to maintain the passing track in a reasonably safe condition for him to walk upon.'' Of course the law as stated on the former trial remains the law of the case, although the court was sharply divided on the propriety of the ruling. But that statement is altogether too broad. It is a matter of common knowledge that a brakeman, when switching cars, often is obliged to walk upon the track between the rails in the performance of his duty, which may include the adjustment of a defective coupler. [Foster v. Davis, 252 S. W. l. c. 435.] The statement might be correct as applied to this case, with the court's construction of the pleading.

The opinion also quotes from the Degonia case 224 Mo. l. c. 589, where this is said : ''An instruction cannot be broader than the pleadings, although the evidence may take a wider range.'' This is a general statement, altogether too broad, and, if unqualified, it wipes out Article VI, Chapter 12, and also Section 1550, Revised Statutes 1919, which provides that when a verdict shall have been rendered the judgment thereon shall not be stayed . . . ''nor . . . be reversed: . . . *ninth, for omitting any allegation or averment, without proving which the triers of the issue ought not to have given such a verdict.''* That statement in the Degonia case would reverse a judgment where a trial goes on to the end without objection that evidence offered is not within the pleading, and the trial court has no opportunity to make correction at the time the alleged error occurs.

On the former trial of this case, so far as the record shows, no objection was offered to evidence to prove that the coupler was defective, on the ground that it was not pleaded in the petition. We think that the principle relied upon on the former trial should not be stated as it is without qualification.

II. We come now to the question whether the proof sustained the allegation. Evidence was offered to show a crack in the end sill

as revealed by a photograph introduced in evidence. Witness Dipert, for defendant, in his testimony said it looked like there was a strap across it. Witness Childers, for plaintiff, examined the photograph and testified that the crack would weaken that side of the car in the switching and jamming of the car; that the picture showed the end sill over to the left was "down."

There is direct evidence as to the defect in the coupler. Mr. Dipert was inspector for the defendant. He saw the car the next day after the injury occurred and made a complete inspection and report of it; his report is in the record. Two weeks later he took the plaintiff Talbert to the car after it had been moved to Chickasha, Oklahoma. He and Talbert looked it over. Dipert testified that the car at that time was in exactly the same condition as it was at the time of the accident; that there had been no repairs or change in it since he examined it first.

Talbert testified that when he examined the car in the presence of Dipert it was between the twenty-second and twenty-fifth of January following the accident on January eighth. He said:

"Well, this coupler was a Latrobe coupler. I know that because I saw the name 'Latrobe' written on the side of it. It had an arm that extended from the coupler out to the side of the car and I took a hold of that arm, which I think is called a pin-lifter, and tried to operate that arm so as to make the coupler work. My experience with that was I took this arm, the handle, with both of my hands and gave it a hard jerk. The one hard jerk didn't open the coupler. Then I took this same position, this handle, and by giving its several successive, quick, hard jerks like that (illustrating), it would gradually make the knuckle, which is a thing something like my hand (indicating) shaped around until I could get it, say, from one-half to two-thirds open. . . .

"Q. In what manner did you put your hand for the measurement? A. Just like I am holding my hand there (indicating), and the distance between, that is, say this pencil is the drawbar and when the drawbar was pressed over to one side as far as it would go and then the distance on the other side of the drawbar and the far side of this carrier iron was about the distance of my fingers here (illustrating), from my thumb to my little finger, which distance I estimated at five inches.

"Q. How much lateral play did that drawbar have according to your examination? A. According to my examination and best judgment it had a lateral play of five inches."

The *effect* of the condition which Talbert described was testified to by several witnesses. Cornelius Sheehan, who had been in the railroad business for several years as switchman, helper and yardmaster testified that if the drawbar had a play of four inches and was clear over on one side or the other and a car coming, he would know that

the drawbar should be adjusted so as to be in line in order to make a coupling.

Mr. Hecke, witness for the defendant, a division superintendent, was asked about his former testimony:

"Q. So if I understand you, a drawbar and its knuckle head can't get over about an inch out of alignment without the car being in bad order, is that right? A. That is right."

This question was read to him from his former testimony, and then he was asked:

"Q. Was that question inquired of you and that answer given? A. Yes sir."

Mr. Saunders, the conductor on the train, testified that the coupler must be in alignment in order to make the coupling. He further testified that it was frequently necessary to align the drawbar in order to make a coupling; he frequently found a condition which required it. Then he was asked if there was no way to do it other than by hand. He answered that there are ways that it could be done, but by hand is the way it *is* done. And then this question and answer:

"Q. What other ways would you say? A. Oh, it could be shoved over with your foot, but that is against the rules, or it could be pushed over with a club or things of that kind, but that is not practical and not very often done."

That Lillard went in front of the car to line up the knuckle is shown by the evidence of Saunders, the conductor, the only eyewitness to the accident:

"I saw Lillard step over the rail, or between the rails of the passing track, and he was in the act or position of doing something to that drawbar. I never was certain whether he was trying to open the knuckle or adjust the drawbar, but he was walking with the car with his hand around the drawbar . . . He fell under or fell in front of the car . . . He fell on his face."

And the testimony of Whitehead, section man, who went to the injured man:

"I stooped down; the blood run out of his mouth, and he couldn't, it looked like, hold his head off the rail, and I stooped down on my knees and took his head in my hand like that . . . Some one asked him how it come to happen, something to that effect, and he says, 'I went to throw that knuckle back and line the drawbar, and my foot sunk in the dirt there and I stumbled and it caught me.' "

This evidence was held admissible on the former hearing.

One J. W. Preston, witness for defendant, a conductor, testified that you could not open the knuckle with the hand without stepping on the track.

Defendant introduced a quantity of evidence to show that the Latrobe coupler was of an approved design, that the coupler on the ballast car was in good order, nothing wrong with it.

There was sufficient evidence to take the issue to the jury as to whether the coupler was out of order in such way as made it necessary for Lillard to step upon the track in the performance of his duty, and the jury found that issue in favor of the plaintiffs.

III. It is further claimed that the verdict on each count was excessive. On the first count the administrator was allowed $4096.80 on account of the mother of the deceased. Lillard was twenty-three years of age. The mother had an expectancy of something over twenty-four years. Lillard, a strong, powerful, capable young man was earning about $125 per month. He sent his mother money from time to time, which she said averaged about ten dollars a month. The appellant figures that $120 a year could not amount to the sum estimated by the jury. In a matter of this kind, in estimating the value a son would be to his mother, there is no hard-and-fast rule determined by the amount he has heretofore contributed to her support. [17 C. J. 821; Frazer v. Bigelow Carpet Co., 141 Mass. 126; Lincoln v. Claflin, 74 U. S. 139.] A son might be of pecuniary value to his mother in the future, although previously he had contributed nothing at all, but had only been an expense to her. There are letters in the record, written by Lillard to his mother, in which he complained about the expense of boarding and his intention to have a home where they might live together.

It is also complained that the judgment on the second count for $10,000 was excessive. Lillard lived about an hour after the injury. Those who saw him during that time described his suffering as awful. He was suffering terrible agony, screaming—a sort of scream, hollering. He was conscious all of the time, up until the time he was put on the train. The doctor gave him a hypodermic, but it did not seem to have any effect. His legs and hip were crushed, his bones and intestines were working out. It is impossible to describe in language the agony which one must suffer in a condition like that. Of course, no amount of money could compensate one for enduring an injury like that, facing death during the hour in which the suffering continued. The consciousness of impending dissolution was a part of the suffering though the pain may have been so intense that the sufferer prayed for death to hasten in order to end it.

The appellant relies upon the case of St. Louis, Iron Mountain & Southern Ry. Co. v. Craft, 115 Ark. 483, later affirmed by the United States Supreme Court, 23 U. S. 648. In that case one, injured in very much the same way that Lillard was injured, lived half an hour. The jury returned a verdict of $10,000 for such suffering, and the Supreme Court of Arkansas required a *remittitur* of $5000.

As to both of these counts it must be borne in mind that the verdict was rendered eleven years after the injury. During all that time the mother of this man was deprived of the sum which should have been paid to her immediately for the damage which accrued to her at the

instant of death. The same may be said of the sum on account of the suffering: it came eleven years after the injury occurred. That might be taken into account as determined by the cases cited. In the Arkansas case the judgment was within a few months of the injury. Further, the value of a dollar at the time of the injury in 1914, was very much less than it was at the time the verdict was rendered. This was considered by this court in Hurst v. C., B. & Q. Ry. Co., 280 Mo. 566, and should be taken into account in the measure of the damages. Five thousand dollars in 1914 would have been worth much more to the estate of the deceased than $10,000 would have been in 1927, both on account of the lapse of time and the decreasing value of the dollar.

The trial court had before it the witnesses and understood the circumstances and general surroundings. We are not prepared to say that the judgment which that court allowed to stand is unreasonable.

The judgment is affirmed. All concur, except *Frank, J.*, not sitting.