THE STATE v. VIRGIL CROUCH, Appellant.—98 S. W. (2d) 550.

Division Two, November 17, 1936.

*J. W. Farris* and *Langdon R. Jones* for appellant.

*Roy McKittrick,* Attorney General, *Wm. Orr Sawyers,* Assistant Attorney General, and *Max Wasserman* for respondent.

COOLEY, C.—Charged by information with murder in the first degree, appellant, defendant below, was convicted of manslaughter

for the killing of one Jacob Walker, sentenced to ten years' imprisonment in the penitentiary and has appealed. We shall refer to appellant as defendant and to Walker as the deceased. The killing is admitted. Defendant claimed that he killed in self-defense. There is no question as to the sufficiency of the evidence to support the verdict, hence a brief statement of the facts will suffice. The State's evidence tended to show the following:

About noon on November 4, 1934, some fifteen or more men were congregated in the railroad stockpen at the outskirts of the town or village of Grayridge. Some were playing cards, others were watching that game and defendant and deceased, with one or two others, were engaged in a crap game. A scuffle arose among those engaged in the crap game, in an effort to take from deceased a bottle of liquor he was supposed to have in his pocket. No one was hurt and apparently no ill will was engendered in that scuffle. Shortly thereafter there was another scuffle among those engaged in the crap game, the origin, cause and details of which are not clear, in which deceased hit defendant a severe blow on the head with a bottle. Defendant complained that he had got a "dirty deal" in being so struck, and showed to several the bruise on his face or head caused by the blow. Deceased protested that he was "only funning" and had not meant to hurt defendant. Defendant, however, appeared to be very angry. There is evidence to the effect that defendant told deceased in substance that he was not big enough to fight him (deceased was a larger and stronger man than defendant), but intimated that he could go home and get his gun and "play even" or something to that effect. Deceased finally told defendant to go and get his damn gun, adding, "I have mine." Defendant left the stockpen and soon returned, the State's witnesses estimating the time at fifteen to twenty minutes, the defendant saying it was in about ten minutes. He came into the stockpen, walked up to within ten or twelve feet of deceased and after the exchange of a few words with deceased shot the latter with a pistol, which he then drew from his pocket. Deceased died before he could be gotten to his home.

The State called most of those who were present at the time of the shooting. Their stories as told on the witness stand differ as to details but those who saw the shooting substantially agree that when deceased was shot he was "squatted down" by the board on which cards were being played and made no hostile demonstration toward defendant nor any movement with his hands as if to draw a weapon and that no weapon was found upon or about him. Several of them, however, said that he told defendant, before the latter left the stockpen, to go get his gun, that he (deceased) had his. Likewise the witnesses did not hear alike the few words that were spoken between defendant and deceased just before the former drew his pistol and shot the latter. One put it this way: Defendant said to de-

ceased, "Jake, you remember what you said?" Deceased said, "Yes, I remember." Defendant said, "Did you mean it?" Deceased said, "Yes, I meant it." Another testified that defendant said to deceased, "I have got what I went to town after." Others attributed to the parties' language differing somewhat in words but not materially in effect so far as concerns the questions we have to decide. It was also shown that some three weeks previously deceased had made threats against defendant which had been communicated to the latter. Defendant, by numerous witnesses, proved that he bore a good reputation as a peaceable, law-abiding man, which was not contradicted by the State. There was also some evidence that deceased was reputed to be of a turbulent, violent disposition. Aside from said testimony relative to the reputation and character of the two men and some testimony as to the severity of the bruise on defendant's face resulting from the blow he had received, the only evidence offered by defendant was his own testimony, which tended to show that he shot in self-defense. As this testimony will have to be discussed in considering the court's rulings on objections made to the prosecuting attorney's argument to the jury we shall state it in more detail in that connection.

Defendant earnestly contends that the trial was characterized by such undue and unreasonable haste and arbitrariness on the part of the court as to amount to a denial of the fair and impartial trial to which every person charged with crime is entitled. Among other things it is complained that defendant was not allowed reasonable time in which to make his peremptory jury challenges; that about thirty minutes after the jury list, with the State's challenges indicated thereon, was handed to his counsel and they and he were in another room considering their challenges, the court, without notice to defendant or his counsel, and in the presence of the prospective jurors, ordered the defendant's bond forfeited and a *capias* issued for him; that on the morning of the second day of the trial, court having adjourned about ten o'clock the night before, to convene at eight o'clock in the morning, one of defendant's counsel was fined, in the presence of the jury, for being five minutes late in reaching the courtroom, although he explained that his watch did not accord with the courtroom clock; that when the State closed its case defendant's counsel were compelled to make their statement to the jury without being afforded reasonable opportunity to confer with their client and were also denied opportunity to confer with him before calling him as a witness so that they might determine, in view of the State's evidence, the proper scope of their examination in chief of the defendant. There are other things complained of in this connection. To some of these rulings and actions of the court no exceptions were saved, but to some of them exceptions were duly saved. Were it not for the fact that we think this case must be remanded on other grounds

this contention of defendant would require a detailed statement of the facts shown by the record and would call for serious consideration by this court. In justice to the trial judge it should be said that his reason, as he indicated, for hurrying the trial was that he had "another murder case" (defendant complains of the use of that language in the presence of the jury), set for the day following that on which this trial began, in which many witnesses had been subpoenaed and therefore the court had to proceed as rapidly as possible with the instant trial. █ Promptness and dispatch by trial courts in the disposal of their business is proper and commendable and of course the court has and must be accorded a large discretion in such matters. But it is equally true and important that there should not be haste at the expense of justice, especially where life or liberty is at stake. We need not and do not decide whether or not there was in this case such undue haste as to amount to an abuse of discretion on the part of the trial court and the denial of a fair trial. These complaints will not probably arise on another trial.

We think this judgment must be reversed and the cause remanded because of statements made to the jury by counsel for the State in argument to the jury and the court's rulings on objections made thereto.

It appears from the record that one of the attorneys representing the State said to the jury in his opening argument that the defendant had testified that he left the stockpen to go and get his gun. Defendant's counsel objected, claiming that he had not so testified. The court overruled the objection, to which ruling exceptions were saved.

In the closing argument for the State the attorney representing the State said to the jury that defendant had testified that he shot deceased because the latter had hit him with a bottle and had made threats and because he, defendant, was mad. Defendant objected, claiming that he had not so testified and the court overruled the objection, to which ruling defendant excepted. In overruling the objection the court said: "He (defendant) said that was one of the reasons." BY MR. JONES, for defendant: "We except. We also except to the remarks of the court that the defendant testified that was one of the reasons for the testimony isn't in the record to that effect." BY THE COURT: "I will not enter into a controversy with counsel for defendant but the jury will remember it and the court is not stating what is in the testimony and the jury will totally disregard that. I was trying to refresh the mind of the counsel as to what was in the record on making the objection. The jury are instructed to disregard anything the court said in passing on the objection."

Defendant again saved exceptions. Note, that while the court directed the jury to disregard what the court had said about the evi-

dence "in passing on the objection" it did not withdraw the ruling *overruling* defendant's objection to the prosecutor's statement.

Defendant did not testify to either of the statements thus attributed to him. As to the first, he testified that he left the stockpen because he thought he was in danger. He also said that in the altercation with deceased he had told the latter that he, defendant, was not big enough to fight him, but not that he said anything about going and getting his gun; and he testified that as he was leaving the stockpen the deceased told him to "go and get my God damn gun, that he had his." He returned in a short time with his pistol in his pocket, as he admitted.

Now, as to said first statement,—that defendant had testified that he left the stockpen to go and get his gun—while it was not a correct statement of what defendant had actually testified to, we would hesitate to hold it and the court's ruling thereon, alone, reversibly erroneous. Defendant did not testify that he left to get his gun, but the inference from his own testimony that such was the fact is so clear and strong that we would hardly feel justified in reversing alone upon the ground that the State's attorney erroneously stated that defendant had so testified and the court erroneously overruled defendant's objection to the statement. That alone might not have been prejudicial, under the circumstances, and nonprejudicial error is not reversible. But as to the second statement, made in the closing argument, that the defendant *had testified* that he *shot deceased* because he was mad and because deceased had hit him and had made threats, a different conclusion must be reached. That statement and the court's action in overruling defendant's objection thereto cannot be held nonprejudicial. The State's witnesses had testified that when defendant re-entered the stockpen he did not have his pistol in his hand, but in his trousers pocket. He did not have it in his hand when the brief conversation occurred between him and deceased just before the shooting. He drew it after those few words were spoken and fired immediately. His own testimony was to the effect that before he drew his pistol the deceased arose or partly arose, reaching toward his pocket as he did so, and that, in view of deceased's prior conduct in striking him and deceased's prior threats, which included a threat to kill him (defendant), and deceased's prior statement that he had his gun, he (defendant) believed deceased was reaching for his gun. On the question of why he shot deceased he testified: "Q. Tell the jury why you pulled the gun and shot him? A. Well, I figured he was going to shoot me. Q. You believed he was going to shoot you? A. Yes, sir. Q. Was that the reason you shot Jake Walker? A. That was one reason. Q. Was that the only reason? A. Well, no, he had threatened me before that." On further examination his meaning as to his testimony concerning threats was further developed and explained thus: "Q. Virgil,

you stated a while ago in answer to one of Mr. Bayne's questions that at the time you shot Jake Walker that you shot him because you were afraid he was going to inflict on you some great bodily injury and because he had threatened you. Explain to the jury what you meant by that, if anything. A. Well, I meant when he made a pass for his gun or his pocket I was—by his threats—that I was more afraid of him. That is what made me fearful because on that account. On his threats. Q. You mean the fact that he had threatened you increased your fear when he made this move? A. Yes, sir."

When the court, in passing upon defendant's objection to the statement of State's counsel in argument, said, "He said that was one of the reasons," it doubtless had in mind defendant's answer, "Well, no. He had threatened me before that." The court's statement did not take into account defendant's explanation of what he meant by that testimony and, moreover, it took no account of the prosecutor's further,—and damaging—statement that the defendant *had testified* that he shot because the defendant had hit him and because he was mad. Even as to the threats the prosecutor's statement in relation thereto, considered with its context, strongly implied, if it did not actually say, that defendant's testimony as to the threats as well as the other considerations mentioned, amounted to a statement that he had shot out of revenge and anger because of such things, including the prior threats, and not because he, at the time, considered himself in danger. Said statement of the prosecutor clearly so said as to the testimony attributed to defendant that he shot because he was mad and because deceased had hit him.

As we have stated, defendant did not so testify: He did testify in substance that those were the reasons *why he returned to the stockpen,* but not the reasons why he shot the deceased. After stating on cross-examination that he left the stockpen because he thought he was in danger he was asked, "Then why did you come back?" to which he replied, "Well, the man had hit me and I wasn't looking at him and I hadn't done nothing to him and I was mad and he had threatened me and told me he had his gun. . . . Q. Notwithstanding he had told you he had his gun, you came back? A. On the stand? Q. No. He did tell you he had his gun and you having that in your mind you did come back? A. Well, not altogether. . . . Q. Well, when you came back you had your gun? A. Yes, I did." But he further said on this point that he made no effort to shoot Walker until the latter made the move toward his pocket, as above pointed out.

Defendant's learned counsel concede that the State's counsel might properly have argued, *as an inference from the evidence,* that defendant did in fact shoot deceased for the reasons stated by State's counsel. But they argue, and we think correctly, that it is quite a

different thing to state to the jury, especially in the closing argument to which they had no opportunity to reply, that defendant *had so testified*. The only defense,—in the sense of justification rather than mere reduction of the grade of the offense charged,—which the defendant claimed, was self-defense. He did assert that defense and gave testimony tending to support it. Whatever we may think or the trial court may have thought of that testimony, its credibility and weight were for the jury. Defendant *could* have come back to the stockpen for the reasons he stated and yet not have intended to attack or shoot the deceased unless the latter attacked him and he had to shoot in self-defense. Grant that he might have stayed away, and doubtless should have, still he had the legal right to go back and remain, conducting himself peaceably, and to defend himself if unjustifiably assaulted. If he had in fact testified that he shot for the reasons stated by the prosecutor such testimony would have destroyed his plea of self-defense, because such reasons would not amount to legal justification for the killing (see State v. Trainer, 336 Mo. 620, 625, 80 S. W. (2d) 131, 134), and the jury would have been authorized to convict him, at least of manslaughter, on his own testimony. The jury of course heard the evidence. But they heard a mass of testimony in the short time the trial lasted, the testimony in the case covering over 220 typewritten pages of the record. Even the trial court seems to have been somewhat confused as to what defendant had testified to. And by overruling defendant's objection to the prosecutor's erroneous statement the court in effect gave such statement its approval, thus intensifying, rather than removing, its prejudicial effect. [State v. Lenzner, 338 Mo. 903, 92 S. W. (2d) 895, 897.] Under the facts and circumstances of this case the remarks of State's counsel and the court's rulings on the objections thereto require reversal of the judgment.

Appellant complains of the refusal by the court of certain instructions requested by him. We have examined the instructions given and refused and are of the opinion that the issues sought to be submitted by the refused instructions were sufficiently submitted by the instructions given.

■ Defendant offered to prove by witness Fred Jones that three or four minutes after the shooting he, defendant, made the statement to Jones and two others, Ed Henry and Loren Butler, ''Boys you know I had to do it in self-defense to save myself,'' his contention being that the statement was admissible as part of the *res gestae*. Jones testified that defendant left the stockpen immediately after the shooting, going toward Grayridge and at a distance of about 135 or 140 yards from the stockpen paused or stopped to talk to Henry and Butler. Jones left the stockpen about two minutes, as he estimated, after the shooting and walked slowly to where defendant, Henry and Butler were. He estimated that it was at least

three or four minutes after the shooting when he so reached said place and defendant's offer was to prove that his said statement was made at that time and place. In support of his contention that the statement was part of the *res gestae* he relies mainly on State v. Stallings, 334 Mo. 1, 64 S. W. (2d) 643, in which the question of *res gestae* is discussed. In that case more time had elapsed between the fatal shooting and the exclamation of the defendant which was offered as part of the *res gestae,* but the circumstances were entirely different and in the opinion of the court were such as to preclude the idea of deliberation and fabrication and to destroy "the argument of the length of time that had elapsed." It is pointed out in that case that the exclamation must be "the apparently spontaneous result of the occurrence operating upon the perceptive senses of the speaker," and that "the ultimate test is spontaneity and logical relation to the main event." In the instant case we think it clear that the element of spontaneity was lacking. The statement was made several minutes after the shooting and at a place considerably distant from the place of the homicide. It was not in the nature of a spontaneous exclamation but rather of the nature of a considered, self-serving statement. Defendant had had time to consider and there is nothing in the record to indicate that he was in such confused or perturbed mental state as to be unable to think clearly. In the Stallings case, under the State's evidence, the exclamation there in question would not have been admissible but the defendant's evidence presented a quite different situation and one differing materially from that shown in the instant case. The Stallings case is not authority for defendant's contention on the facts of this case. We think the trial court was right in holding that the statement in question was not part of the *res gestae* and in excluding it.

There are some other alleged errors assigned in the motion for new trial which we deem it unnecessary to discuss. The judgment of the circuit court is reversed and the cause is remanded. *Westhues* and *Bohling, CC.,* concur.

PER CURIAM:—The foregoing opinion by Cooley, C., is adopted as the opinion of the court. All the judges concur.