HERMAN SCONCE v. JOHN W. JONES and ERNIE AMONENO, Doing Business as INTERSTATE FILM DELIVERY, Appellants.—121 S. W. (2d) 777.

Division One, November 19, 1938*

*NOTE: Opinion filed at May Term, 1938, May 26, 1938; motion for rehearing filed; motion overruled at September Term, November 19, 1938.

*McReynolds & Flanigan, George V. Farris* and *Ray Bond* for appellants.

*Frank R. Birkhead* and *McAllister, Humphrey, Pew & Broaddus* for respondent.

HYDE, C.—This case, recently reassigned to the writer, is an action for damages for personal injuries brought by an employee against his employers. Plaintiff had a verdict for $15,000. Defendants have appealed from the judgment entered.

The negligence charged and submitted was defective condition of the truck in which plaintiff was riding (front wheels shimmied and brakes acted unevenly), which it was claimed defendants had refused to remedy after complaint. It is conceded that plaintiff had sufficient substantial evidence on this issue to make a jury case, and only two assignments of error were made: (1) That the court erred in admitting hearsay testimony about self-serving statements made by plaintiff after the accident; and (2) that the court erred in refusing to discharge the jury because plaintiff's attorney by cross-examination of defendants' witnesses injected into the case the idea that an insurance company was interested in the defense. Plaintiff was employed by defendants to drive a truck at night over a 300-mile route in southwest Missouri for the purpose of transporting moving picture films between theatres. Plaintiff's brother-in-law, Bert Morton, went with him as a relief driver on the night of the accident. Morton began driving that night at Monett. Plaintiff sat beside him on the seat of the truck. Morton drove to Marionville

on U. S. Highway 60 and thence, on State Highway 13, east for three miles to a point where the road made a sharp curve to the south. The truck ran off the road at a culvert near the beginning of this curve. State Highway 13 was paved with blacktop surface about 16 feet wide and had loose gravel on the shoulders. About 30 feet west of the culvert there was a road running north from the highway. Defendants' defense was that the cause of the accident was careless driving in a dense fog.

Plaintiff's account of this occurrence, given at the trial, was as follows:

"Just as he (Morton) topped the decline the front wheel started shimmying and he pushed on his brakes and it caused the car to start jerking and jumping and pulled us on the left side of the road and he released his brakes and when he applied his brakes again it pulled the car on the north side of the road before we reached this culvert and pulled us off the embankment down into the culvert. . . . I could see him pulling on the wheel and when he applied the brakes the second time it grabbed again; it was pulling to the left and he was pulling to the right and it pulled us off the shoulder. We were going about twenty or twenty-five miles an hour and when he applied his brakes it cut us down to about twenty. . . . The accident pushed the film on top of us, pushed the motor back through the floor boards and had Morton pinned, and I had rolled on top of him and the films were on top of us. He was conscious just a few minutes. . . . I had both legs broken, my skull fractured in two places, my nose broken in two places and I was lying on top of him and had the foot of my right leg twisted around in back of my head, which was lying in his lap; I was not able to move myself and was not conscious all of the time. I was flickering the clearance lights on the truck. . . . The first man who came to me was Mr. Amos Peters, who has a route for a Springfield newspaper. The accident happened about 2:15 and Mr. Peters came along about 3:30 Sunday morning; two other cars had passed but didn't stop. . . . It is my testimony that one of the brakes out of the four grabbed and didn't turn loose and that this happened several times with this truck. I had driven this truck myself two and one-half months and it started doing that when I first started driving it. The left front wheel was sliding, I could tell which wheel locked because I could feel the car when it jerked over."

Plaintiff made a statement, about a week after the accident, while he was in the hospital in which he said:

"When we got on Highway 13 I told Morton to take it slow as the fog was real bad. . . . We never did see the signs marking the curve, and I knew they were there. The fog was so heavy we couldn't see them. . . . Bert just drove straight too far and then tried

to turn with the road, but it was too. late, and the car hit the east flange of the culvert and turned over on its left side. There was nothing mechanically wrong with the car that caused the accident.''

Plaintiff's deposition was taken several months later, after he had left the hospital. In that deposition he said: ''It was kind of a misty, foggy, night. . . . It was foggy enough that you couldn't drive very fast, but it wasn't foggy enough that it would keep you from traveling.'' At the trial he testified as follows: ''We first struck a fine mist that night, kind of a drizzling mist, after we left Monett. It did not obscure our view; it stopped about eight miles out of Monett and we did not run into any fog or mist thereafter; the windshield wiper was not going at the time of the accident.''

There were other witnesses for the plaintiff who gave statements after the accident to the effect that it was foggy but testified at the trial that it was not. Defendants had a number of witnesses who testified that it was very foggy. There was also conflicting evidence about wheel marks in the gravel of the north shoulder and across the road which ran north from the highway just west of the culvert. Plaintiff's witnesses testified that there was a furrow in this gravel which they said showed that the left front wheel was sliding. The testimony concerning which defendants assign error was the testimony of three witnesses as to statements made by plaintiff before he was removed from the truck. This testimony was given by Mr. Peters, who first discovered the wrecked truck; by Mr. Childers, a farmer who lived across the highway and who was awakened by Mr. Peters and remained at the scene while Mr. Peters went back to Crane for additional help; and by Mr. Carr who drove from Crane in his own car following Peters back to the scene of the accident. Mr. Peters testified that, while on his way to get his morning papers, he discovered the truck turned over below the highway, stopped his car, and went to it. He said: ''He (plaintiff) was able to talk to me; I didn't know there was another person in the car until he told me.'' Upon objection, he was not permitted to state his further conversation with plaintiff at that time. Peters further testified that he then went to the house nearby and awakened Mr. and Mrs. Childers, then drove back to Crane where he called a doctor, and got the night watchman to go back to the scene of the accident with him in his car. He also awakened Mr. Carr, and got him to drive out in his own car with more help.

He further testified as follows:

''After I got back I just stayed a very few minutes at the scene. Mr. and Mrs. Childers were there, and I don't think anybody else was there; I then went on my paper route. . . . When I first came to the scene of the accident I wasn't driving rapidly because I wasn't crowded for time, but going back I really drove fast to Crane

and back to the scene of the accident, and there was nothing but a little mist in the air. . . . Q. When you walked up to the car where these persons were, did you talk to Mr. Sconce? A. Yes, sir. Q. Did you ask him what was the cause of the accident?'' Upon objection to the last question, the court said: ''It would be an expression made before he extricated himself from the difficulties, and I think there are respectable authorities on it. . . . The Court overrules the objection on the theory it is part of the *res gestae*, he not having extricated himself from the position which he was then in.'' There was an exception taken, and the witness then answered: ''I asked him what happened—did his lights go out—and he said, 'No.' . . . I didn't ask him anything else, but he said, 'My brakes locked.' He said, 'Our brakes locked.' He was really speaking for the dead man.''

Mr. Childers' testimony was, as follows:

''My wife and I went there between thirty and forty minutes before any one came (after they were awakened by Peters), at which time Mr. Carr, Mr. Johnston and Mr. Rickman came from Crane. . . . It seems to me like his head was on the dead man and one of his legs was in a strain. I helped to get it straight. They were in the front part of the car; the seats were all broken up. I kind of believe there was something piled on them. Q. Was Mr. Sconce conscious? A. He was at that time, yes. Q. Did you talk to him? A. Yes, sir. Q. Did you ask him about the accident? A. Yes, sir. Q. Did you ask him how it happened? A. Yes, sir. Q. What did he say? By Mr. BOND: Object to that, as hearsay and not a part of the *res gestae*. By the COURT: Overruled. I will permit him to make that statement. (Exception) . . . A. Well, the first thing I asked him when I went over there was if he was by himself, and he says, 'I am now. My brother-in-law was with me, but I think he passed away a few minutes ago.' And I says, 'Was you driving?' And he says, 'No, I wasn't; he was driving.' I says, 'Have you any idea of how it happened?' And he says, 'Yes; I think the brakes grabbed. First it went to shimmying, and then he braked it and it pulled us off to the left.' ''

The testimony of Mr. Carr was, as follows:

''When we got to the scene of the accident, Mr. and Mrs. Childers were there. Mr. Peters and Mr. Rickman had got there ahead of us, and were still there. . . . Q. Then, did you talk to Mr. Sconce? A. Yes, I talked to him. Q. Did you ask him how this accident occurred? By Mr. BOND: Just a moment. Object to any testimony concerning conversation had at that late hour, from this man; it could only be a narrative of past events, and not spontaneous. By Mr. PEW: He had never been taken from the accident. By the COURT: No; and I have been permitting statements made on the

theory that it was part of the *res gestae* so long as the situation remained there, and there was no opportunity for consideration or thought, and he had not been extricated from the entanglements that surrounded him; and I believe I will still hold to that theory. (Exception) . . . By Mr. Bond: I would like to ask a qualifying question: Mr. Carr, Mr. Peters had been there to the scene of the accident ahead of you and had driven back to Crane and woke you up and told you about it, and then you went up there? By the Witness: Yes, sir. By Mr. Bond: So this was after. By the Court: I believe I will permit it. (Exception) . . . Q. (By Mr. Pew) You talked to him about how the accident occurred? A. Yes, sir. Q. What did he say? A. I just asked him 'how come,' what was the matter, and he said a wheel locked and pulled him off in there, the brake locked.''

There are at least two very different kinds of statements which are received in evidence under the designation of *res gestae*. One kind can properly be classified as verbal acts, which actually are a part of the transaction under investigation. Naturally they must be contemporaneous with it to be part of it. (But not every statement contemporaneous with a transaction is part of it.) The hearsay rule is not applicable to this class of statements; they are admissible because they are ''a part of some otherwise relevant act.'' [3 Wigmore on Evidence, 770-776, secs. 1766-1768; see, also 3 Law Series 45, University of Missouri Bulletin; for further suggested classifications see 31 Yale Law Journal 229; 3 Jones on Evidence 2190, sec. 1194.] Clearly, the statements under consideration in this case are hearsay and do not come within the above classification. The principal reason for excluding testimony as to statements made by others out of court is that the test of cross-examination, of the person making them at the time they are made, is unavailable as a safeguard against falsification or inaccuracy. This is the basis of the hearsay rule. The statements, herein involved, must come in, if at all, under the classification of the exception to the hearsay rule, which under certain circumstances permits testimony as to statements, made by a person involved in or present at an accident, declaring the circumstances of an injury at or after its occurrence. [3 Wigmore, 735, secs. 1745-1757; 3 Jones on Evidence, 2186, chap. 12; 10 R. C. L. 986, secs. 169-171; 101 A. L. R. 1197; note; 76 A. L. R. 1122, note; 42 L. R. A. (N. S.) 917, note; 22 C. J. 443, sec. 535 et seq.] The essential test of this class of statements is spontaneity. The lapse of time involved is material mainly as evidence of lack of spontaneity.

Wigmore thus states the exception making such spontaneous statements admissible, and the reasons for it:

"This general principle is based on the experience that, under certain external circumstances of physical shock, a stress of nervous excitement may be produced which stills the reflective faculties and removes their control, so that the utterance which then occurs is a spontaneous and sincere response to the actual sensations and perceptions already produced by the external shock. Since this utterance is made under the immediate and uncontrolled domination of the senses, and during the brief period when considerations of self-interest could not have been brought fully to bear by reasoned reflection, the utterance may be taken as particularly trustworthy (or, at least, as lacking the usual grounds of untrustworthiness), and thus as expressing the real tenor of the speaker's belief as to the facts just observed by him; and may therefore be received as testimony to those facts."

A good illustration of an admissible statement of this character, tending to show the cause of an automobile accident, is found in Bennette v. Hader, 337 Mo. 977, 87 S. W. (2d) 413, 101 A. L. R. 1190. There the driver's father (riding in the rear seat) told him that a "car crowded us off the road." This court ruled the statement to be admissible, saying: "The statement in the instant case was made 'just a minute' after declarant became conscious, at the scene of the accident, while he was suffering pain, upon his first learning of the death of his companion, while parties were gathering at the scene, before the excitement had subsided, and without being planned or cogitated; and, under the cases cited, its admission in evidence was not error, as it apparently was the spontaneous result of the accident and resulting death upon the senses of the speaker rather than the result of premeditation, design, *or reasoning from the facts.*" (Our italics.) Clearly, this was a statement of a fact, which the person making it had full opportunity to observe, and not a conclusion of fact reached by reasoning from other facts. This witness could see another car approaching on the wrong side of the road. It is not possible to thus see the operation of brakes and one, who is not operating them himself, could not know just how the driver had attempted to operate them or feel the reaction and effect of his attempt as the driver could.

Some of the principal limitations upon the application of this exception to the hearsay rule are that a statement, to be admissible, must neither be mere reflective narration of past events (22 C. J. 467, sec 556; 10 R. C. L. 979, sec. 161; 3 Jones on Evidence, secs. 1198-1200; Woods v. Southern Railroad Co. (Mo.), 73 S. W. 374; Leahy v. Cass Ave. & F. G. Railroad Co., 97 Mo. 165, 10 S. W. 58.); nor an opinion, nor conclusion of fact reached by reasoning from other facts. [22 C. J. 469, sec. 558; 3 Jones on Evidence 2215, sec. 1206; Atkinson v. American School of Osteopathy, 240 Mo. 338, 144 S.

W. 816; Norman & Sons v. Clark (Tex.), 221 S. W. 235; 42 L. R.
A. (N. S.) 938, note; Bennette v. Hader, supra.] Certainly the
true test is neither the time nor the place of a statement but whether
it is a spontaneous statement produced by the event itself. We must
consider, in the light of these principles, the statement in Jones on
Evidence (Vol. 3, p. 2213, sec. 1205), cited by plaintiff, that "dec-
larations of the injured person before he is completely extricated
from the instrumentality of injury" are *"usually"* admissible. Here
plaintiff's evidence did not show that either he nor Morton were im-
mediately unconscious (at least plaintiff knew Morton was con-
scious thereafter); that plaintiff was only unconscious part of the
time before Peters discovered the accident; that he regained con-
sciousness and began turning the lights on and off to attract atten-
tion; that he knew two cars passed without stopping while he was
doing this; that he talked to Peters, Childers, and Carr about other
matters before he talked about the cause of the accident; and that in
each case he made the statement as to the cause in answer to ques-
tions about it. If he first stated the cause to Mr. Childers, then
he had previously talked to Peters and to Mrs. Childers before he
did so. It is argued here that plaintiff made the statement to Peters
when he first discovered the wreck instead of after his return with
help from Crane. The record does not clearly so show but gives
the opposite impression, and the burden of making a sufficient show-
ing of spontaneity, to make the statement admissible, was on plain-
tiff. [Woods v. Southern Railroad Co., supra; Aetna Life Ins. Co.
v. Kern-Bauer (C. C. A.) 62 Fed. (2d) 477; 22 C. J. 462, sec. 550.]
We cannot find that plaintiff's evidence shows that he was under
such influence of shock or pain as to be unable to reflect or reason
after the accident so that these statements would be, when made,
spontaneous utterance of thoughts created by or springing out of
the event itself, or that they were the event speaking through the
person instead of the person speaking about the event. [State v.
Crouch, 339 Mo. 847, 98 S. W. (2d) 550; Woods v. Southern Ry.
Co. (Mo.), 73 S. W. (2d) 374; State ex rel. Kurz v. Bland, 333 Mo.
941, 64 S. W. (2d) 638; State v. Stallings, 334 Mo. 1, 64 S. W.
(2d) 643; Lynch v. M.-K.-T. Railroad Co., 333 Mo. 89, 61 S. W.
(2d) 918; Demaray v. M.-K.-T. Railroad Co., 330 Mo. 589, 50 S.
W. (2d) 127; Smith v. S. I. & M. B. Co., 326 Mo. 109, 30 S. W.
(2d) 1077; Woods v. St. L. M. B. T. Railroad Co. (Mo.), 8 S. W.
(2d) 922; Landau v. Travelers' Ins. Co., 305 Mo. 563, 267 S. W.
376; Vaughan v. St. L. & S. F. Railroad Co., 177 Mo. App. 155, 164
S. W. 144; Leahy v. Cass Ave. & F. G. Railroad Co., 97 Mo. 165,
10 S. W. 58.]

█ Furthermore, if the truck slid toward the edge of the road,
plaintiff, to reach the conclusion that improper action of the brakes

did cause it, had to reason that it did not begin skidding from slick condition of the blacktop pavement (this might happen from sudden application of brakes which acted properly); that it did not slide because of the loose gravel of the shoulder and the intersecting road (which might result, whether brakes were applied or not, if the driver ran off the edge of the blacktop because not expecting the curve); and further that the result, together with his sensations and observations, made him believe that the brakes were operating on one side and not on the other. Since plaintiff was an experienced truck driver it was proper for him to give his opinion or conclusions of fact, concerning the cause of the truck leaving the road, to the jury at the trial as an expert witness. [Varley v. Columbia Taxicab Co. (Mo.), 240 S. W. 218; Young v. Wheelock, 333 Mo. 992, 64 S. W. (2d) 950; Murphy v. Cole, 338 Mo. 13, 88 S. W. (2d) 1023.] There he would and did state the facts he had observed or assumed to be true as the basis of his conclusion, and was subject to cross-examination to test their accuracy. Certainly, this shows that plaintiff's statements, made more than an hour after the occurrence, as to the cause of the truck leaving the road, was not merely a narrative of past events only (which in part it was), but that it was also a statement of the result of his reasoning from his recollection of such past events. Clearly, therefore, the trial court was wrong in ruling that the statements admitted were not the result of ''consideration or thought.'' They could not, in fact, have been the result of anything but consideration and thought. Certainly, it was prejudicial to admit them, in a case with such closely contested issues, where plaintiff had at the trial completely contradicted his written statement and to a material extent his deposition. [Conduit v. Trenton Gas & Electric Co., 326 Mo. 133, 31 S. W. (2d) 21.] It is, therefore, not necessary to consider the second assignment.

The judgment is reversed and the cause remanded. *Ferguson* and *Bradley, CC.,* concur.

PER CURIAM: The foregoing opinion by HYDE, C., is adopted as the opinion of the court. All the judges concur.