MINNIE E. JOHNSON, Administratrix of the Estate of SAMUEL R. JOHNSON, Deceased, v. SOUTHERN RAILWAY COMPANY, a Corporation, Appellant.—No. 38571.—175 S. W. (2d) 802.

Division One, October 4, 1943.

Rehearing Denied, November 1, 1943.

Motion to Transfer to Banc Overruled, December 6, 1943.

*Kramer, Campbell, Costello & Wiechert, Fordyce, White, Mayne, Williams & Hartman* and *Norman J. Gundlach* for appellant; *S. R. Prince* and *H. G. Hedrick* of counsel.

1112

*Mark D. Eagleton, James A. Waechter* and *William H. Allen* for respondent.

1114

■ HYDE, J.—Action for damages for conscious pain and suffering and for death of Samuel R. Johnson, plaintiff's husband, brought under the Federal Employers' Liability Act. (45 U. S. C. A., Secs. 51-60.) Plaintiff had judgment for $30,000.00 and defendant appealed.

■ The main question is: Did plaintiff make a jury case? There is no dispute as to the interstate character of the work. The negligence charged and submitted was that while Johnson and Hopson (a fellow employee) were riding on the front end of defendant's engine, Hopson moved the cutting lever (used to open the front coupler) so as to strike Johnson and cause him to fall from the engine. Defendant says that plaintiff produced no substantial evidence to prove this charge, and that its requested peremptory instruction should have been given.

Johnson was flagman of the train crew, the other members of which were Hopson, brakeman; Davis, conductor; LaGrange, engineer and Dearing, fireman. They were switching cars in defendant's yards at Mt. Vernon, Illinois. Just before Johnson was injured, their engine had pushed a gondola car, loaded with scrap metal, west on the scale track, which was the south track of four parallel tracks running east and west through the yards. The engine pushed the gondola car ahead of it, west, on to the scales where it was weighed. The engine then backed east, pulling the gondola car a few feet off the scales and stopped. The gondola car was uncoupled by Johnson by use of the coupler lever on that car, and the engine backed on east with its front coupler knuckle closed.

The next move to be made was for the engine to back, east, off of the scale track on to track No. 2 (the next track to the north) go west on track 2 past the gondola car to the west scale track switch,

and then back, east, on to the scale track to couple the gondola car behind the tender. Johnson lined the east scale track switch to get the engine on to track 2. Davis went west to line the switch at the west end of the scale track. When the engine started west on track 2, Johnson got on the sill step on the front of the engine on the left, south, side. Hopson got on the other front sill step on the right, north, side. There were smaller sill steps, just inside the large ones, higher and nearer the center of the engine, which were for use in climbing on to the sill. (Top of the pilot or cowcatcher.) As the engine went west on track No. 2 (at six or seven miles per hour) Johnson was standing with his left foot on the lower outside sill step and with his right foot on the higher inside sill step, facing Hopson, explaining to him the next movement. There was a horizontal steel bar across the top of the sill, connected with the coupler in the center of the pilot, called the cutting lever. At each end of this bar on the outside of the outside sill step the bar turned down vertically, making a handle for use in operating the cutting lever. When this lever was raised, it pulled the pin out of the coupler and opened the knuckle. When the cutting lever handle on one side was raised it caused the cutting lever handle on the other side to be likewise raised.

Johnson's duty was to get off when the engine passed the gondola car and open the west coupler of that car. Davis, standing at the west switch between No. 2 track and the scale track, was watching the approach of the engine as it was coming west on track 2 passing north of the gondola car about seven car lengths from him. He said he saw Johnson take his right foot down from the inside sill step, face west with both feet on the outside sill step and lean over to the left, south, it being his duty at that time to observe "whether the number 2 switch was lined or not". While Johnson was thus leaning out, Davis saw Hopson make a move with his right hand, then get off the engine and give a stop sign. At the same time he saw Johnson fall off the engine against the side of the gondola car. Davis said that in this first movement, Hopson brought his hand up from a vertical position "about up to his hip." He said that he did not observe whether or not his hand was closed or whether or not he had hold of the cutting [804] lever and that he did not "know if he pulled the cutting lever." However, he demonstrated before the jury the movement he saw Hopson make and also demonstrated the kind of movement one would make in using the cutting lever.

Davis then further testified as follows:

"Q. Is that movement you just made of the cutting lever and the kind Hopson made one and the same? A. Similar.

"Q. Now, then, Mr. Davis, what did you see at the time this movement was made by Mr. Hopson that you described? What did you see with reference to Johnson? A. I seen Johnson fall off the engine." On cross-examination, he said: "whether he (Hopson)

pulled the cutting lever or whether he didn't pull the cutting lever I can't say.''

The engine coupler knuckle was found open by Davis after Johnson was injured but he made this inspection after Johnson was taken to the hospital. Johnson was an experienced trainman with 22 years of service. Hopson was 26 years old, employed by defendant ''for four and a half years'', and ''was an extra man'' on this crew who worked ''on Extra Board.'' Hopson signed a statement which contained the following: ''While riding the engine it is customary to hold on to the cutting lever to open the knuckle on the engine—front end—or not—I might have, but don't remember, as I understand the knuckle on the engine was open after the accident.'' There was no reason for opening the knuckle on the front of the engine at that time because the gondola car was to be coupled behind the tender. Hopson testified at the trial that he did not open it and signed the equivocal statement because it was suggested by representatives of the Brotherhood of Railroad Trainmen who prepared it. He said, concerning Johnson's fall: ''I was looking forward, and I heard a sharp cry, and as I glanced to my left I saw Mr. Johnson's feet in the air. It seemed as though he was going over backwards. And I immediately gave the engineer a stop signal and got off and ran around the engine.'' It was shown that, when Johnson was leaning out the way Davis observed him, the cutting lever handle would have been ''right about the center of the back . . . and near his buttocks.'' Hopson also demonstrated the various kind of signals before the jury.

We think that the above facts (which are, of course, on this point stated from the viewpoint most favorable to plaintiff's case)' afforded sufficient circumstantial evidence to warrant the jury in finding that Hopson did raise the cutting lever handle on his side so as to cause the handle on the other side to strike Johnson and cause him to fall. Davis, about 100 yards away, saw a movement of Hopson's hand which he said was similar to the movement he would make to raise the cutting lever. Johnson was in such a position that the handle, so moved, would strike him; and Davis said he fell from the engine sill step at the very time he saw the movement made by Hopson. After Johnson's injury the coupler knuckle was open. It required a jerk with considerable force to open it. Davis demonstrated before the jury both the movement he saw, the movement required to open the knuckle and the kinds of signals defendant claims were given. The trial court had the benefit of these demonstrations (which we do not have) in deciding whether the circumstances shown tended to prove plaintiff's claim.

Defendant points out some alleged inconsistencies in the cross-examination of Davis to show that the movement he saw Hopson make was more likely to have been a stop signal than a movement of the

cutting lever, but it was for the jury to decide this issue from what they saw and heard. There were also corroborating declarations (claimed to be admissible as spontaneous utterances under the res gestae exception to the hearsay rule) which we do not now consider in ruling whether or not a jury case was made. Moreover, Johnson was an experienced train man who knew what his duties were, and where and how to get off to perform them. No basis appears for explanation of what, other than moving the cutting lever, could have caused him to fall as he did. Thus the evidence, even though circumstantial, when considered as a whole shows a substantial reasonable basis for a finding that moving the lever did cause it. Certainly under the more recent decisions of the United States Supreme Court, we must hold that such circumstantial evidence was substantial evidence. [Bailey v. Central Vermont Ry., 319 U. S. 350, 63 S. Ct. 1062, 87 L. Ed. 1030; Tiller v. Atlantic Coast Line R. Co., 318 U. S. 54, 63 S. Ct. 444, 87 L. Ed. 31; Seago v. New York Central R. Co., 348 Mo. 761, 155 S. W. (2d) 126; Reversed 315 U. S. 781, 62 S. Ct. 806, 86 L. Ed. 1188; Conformed to 349 Mo. 1249, 164 S. W. (2d) 336; Jenkins v. Kurn, 346 Mo. 904, 144 S. W. (2d) [805] 76; Reversed 313 U. S. 256; 61 S. Ct. 934, 85 L. Ed. 1316; Conformed to 348 Mo. 942, 156 S. W. (2d) 668.] We, therefore, hold that plaintiff did make a case for the jury.

Defendant also assigns error in admitting, over its objection, the testimony of plaintiff as to the declarations, hereinafter set out, made by Johnson when she first saw him at the hospital after his injury. Plaintiff's testimony as to this was as follows:

"Q. Tell us what you said to him and what he said to you. A. I said, 'Honey, it is me.' He said, 'Joe, why did you pull that cut lever and knock me off?' I said, 'Honey, it is me.' And he said, 'Joe, why did you pull that cut lever and knock me off?'"

Davis said that immediately after Johnson was injured he "ran to a nearby house . . . and used the telephone" to call the agent at the station, told him "Johnson was severely hurt", and asked him to send an ambulance and doctor. He said he made this call at 3:55 p. m. and that the ambulance came in about ten minutes. While waiting for the ambulance he said: "Johnson was apparently in a very bad shape. He was groaning and going on, 'Oh, help me; do something for me; oh, help me; do something for me.'" Hopson said: "He seemed dead to me, but came to when we picked him up, but when placed on a stretcher he seemed unconscious when placed in the ambulance." Plaintiff, who lived seven miles from town, said that she was expecting her husband to call her when he finished his switching work and was ready to drive in and meet him. She said the station agent called her about 4:00 p. m. and told her of his injury, and that she reached the hospital in about 15 minutes just as the ambulance was leaving. She found Johnson "at the head of the

stairs in the receiving room", and "he was suffering terrible, and complaining of his back." She also testified that she stayed with him at the hospital that night and until 6:00 A. M. the next day and that he did not recognize her during that time, but that when she went back between 8:30 and 9:00 A. M. he did recognize her and called her by name.

On cross-examination, plaintiff further testified, as follows: "Q. Now, then, Mrs. Johnson, when you first saw Mr. Johnson he was unconscious, wasn't he? A. Yes. Q. And he didn't know you, did he? A. Well, I don't think he did. Q. Well, he didn't recognize you, did he? A. No. Q. And he didn't appear to know what was going on around there, did he? A. He was in a very shocked condition. Q. But he didn't appear to know what was going on around there, did he? A. I don't think so." Thereafter motion to strike her testimony was made and overruled.

Defendant contends that Johnson's declarations were inadmissible because made by him "while unconscious and in a severe shocked condition." so as to render them "highly unreliable" and "of no probative value." Defendant cites the comment of this court in State v. Reed, 137 Mo. 125, l. c. 134, 38 S. W. 574 (a dying declaration case which incidently disapproved Tracy v. People, 97 Ill. 105, also cited by defendant), and Mayfield v. State (Tex.), 25 S. W. (2d) 833. (Apparently discussing only the dying declaration rule on this point, from its citation to Underhill's Criminal Evidence 182, Sec. 222 in 4th Ed., and the two Texas cases cited.) The admissibility of dying declarations, which are necessarily narration, rest upon an entirely different theory from that of spontaneous declarations which are considered to be the result of the event speaking through the person and cannot be his narration. [Sconce v. Jones, 343 Mo. 362, 121 S. W. (2d) 777; State v. Crouch, 339 Mo. 847, 98 S. W. (2d) 550; Woods v. Southern Ry. Co. (Mo. Sup.), 73 S. W. (2d) 374; State ex rel. Kurz v. Bland, 333 Mo. 941, 64 S. W. (2d) 638; State v. Stallings, 334 Mo. 1, 64 S. W. (2d) 643.] In the case of such spontaneous declarations, the competency of the person as a witness is not controlling on admissibility. Thus such declarations are admitted though made by a child too young to comprehend the obligation of an oath provided he has sufficient intelligence and understanding to comprehend the event involved. [20 Am. Jur. 574, Sec. 678; Annotations 65 L. R. A. 318, L. R. A. 1915E, 202; 32 C. J. S. 25, Sec. 410; 6 Wigmore on Evidence, 156, Sec. 1751.] Wigmore suggests that the disqualification of insanity should probably be treated like that of infancy for this purpose. [See Wilson v. State (Tex.), 90 S. W. 312, l. c. 315, which also holds that a showing of consciousness [806] is unnecessary.] In cited Sec. 410, C. J. S. it is stated "The fact that a person injured was dazed and shocked at the time of making a statement as to how he received the injury does not render his

statement inadmissible, but bears merely on the weight and credibility thereof.'' [As to such declarations made just as consciousness is regained see State v. Stallings, supra; Bennette v. Hader, 337 Mo. 977, 87 S. W. (2d) 413; 20 Am. Jur. 568, Sec. 672; Annotation 42 L. R. A. (N. S.) 967.] Of course, if the declarant were· delirious, speaking incoherently or talking in his sleep, there might not be sufficient basis of trustworthiness to give them any probative value. [See 20 Am. Jur. 504, Sec. 594; Martinez v. People, 55 Colo. 51, 132 Pac. 64; Steurer v. Ried, 56 Ill. App. 245.]

However, such spontaneous declarations (without the sanctity · of an oath or the test of cross-examination) are admitted on the theory ''that they derive their credibility from the stress of circumstances under which they are made, and not from the trustworthiness of the person making them.'' (20 Am. Jur. 573, Sec. 678.) ''Since · this utterance is made under the immediate and uncontrolled domination of the senses, and during the brief period when considerations of self-interest could not have been brought fully to bear by reasoned reflection, the utterance may be taken as particularly trustworthy (or, at least, as lacking the usual grounds of untrustworthiness), and thus as expressing the real tenor of the speaker's belief as to the facts just observed by him; and may therefore be received as testimony to those facts.'' [6 Wigmore 135, Sec. 1747; See also Underhills' Criminal Evidence 4th Ed., Sec. 201.]

Was not the present situation one, in which it could truly be said that the event was speaking through the person? Was it not a spontaneous utterance created by and springing out of the event itself? From its nature, apparently Johnson did not realize that he had been removed from the scene of the event and thought Hopson was still present. But it does not follow that he had no comprehension of the event. While plaintiff said he was unconscious this was a conclusion. Underhill, in discussing dying declarations (Sec. 222), says ''a non-professional witness may not testify that, in his opinion, the declarant was delirious at the time he made his dying statement unless he can state all the facts upon which his conclusion is based.'' So here any such opinion is to be considered in connection with the facts on which it is based. Plaintiff did state facts showing Johnson's awareness of pain (''suffering terrible and complaining of his back'') which indicates some recovery of consciousness. In State v. Stallings, supra, the testimony (of a doctor) was that Stallings ''was conscious but seemed dazed.'' Hopson said that Johnson first seemed dead but came to when picked up, so it seems that his periods of unconsciousness were intermittent. Defendant does not contend that the stress and shock of the event had worn off but rather that it was still too great for the senses to operate at all. The trial judge has some discretion to determine such matters preliminary to passing upon admissibility. [Landau v. Travelers' Ins. Co., 305 Mo. 563, 267 S. W. 376, and· cases cited.]

Therefore, where a reasonable basis for a finding of spontaniety and probative value appears, we should defer to his finding since he had the witnesses before him. We, therefore, rule that there was no error in admitting these declarations under the circumstances shown, which were to be considered by the jury in determining its weight and value; and, of course, the matter of credibility was solely for their determination.

Defendant further contends that the verdict is excessive. Johnson was 43 years old and was earning about $200.00 per month, of which about $180.00 per month or $2160.00 per year went to the support of his wife and invalid incompetent daughter. We reviewed death cases under the Federal Employers' Liability Act in Hancock v. Kansas City Terminal R. Co., 347 Mo. 166, 146 S. W. (2d) 627. Under those cases, and the later cases of Benner v. Terminal R. Assn. of St. Louis, 348 Mo. 928, 156 S. W. (2d) 657; Finley v. St. L.-S. F. R. Co., 349 Mo. 330, 160 S. W. (2d) 735, and Miller v. Terminal R. Assn. of St. Louis, 349 Mo. 944, 163 S. W. (2d) 1034, a verdict of $25,000.00, for damages for death alone, should not be held excessive. Johnson was injured on Dec. 30, 1940, and died on Jan. 16, 1941. Plaintiff testified that except for the last three days before his death, Johnson was conscious and "suffered terrible all the time." Considering amounts which have been approved for conscious pain and suffering, we cannot [807] hold that this verdict was excessive. [See Talbert v. Chicago, R. I. & P. R. Co., 321 Mo. 1080, 15 S. W. (2d) 762; Noce v. St. L.-S. F. R. Co., 337 Mo. 689, 85 S. W. (2d) 637.]

The judgment is affirmed. All concur.