**HODGE DRIVE IT YOURSELF INC., Plaintiff-Appellant, v. CINCINNATI GAS & ELECTRIC COMPANY, Defendant-Appellee.**

Ohio Appeals, First District, Hamilton County.

No. 7288. Decided November 6, 1950.

Burke & Cooney, Gordon Wilson, Cincinnati, for plaintiff-appellant.

Peck, Shaffer & Williams, Andrew J. Conroy, Cincinnati, for defendant-appellee.

(DOYLE, PJ, of the Ninth District: McNAMEE, J, HURD, J, of the Eighth District sitting by designation.)

## OPINION

By McNAMEE, J:

The plaintiff, Hodge Drive It Yourself, Inc., seeks a reversal of a judgment entered in the Common Pleas Court of Hamilton County upon a verdict of the jury in favor of defendant, The Cincinnati Gas & Electric Company.

This action arose out of an explosion which occurred on July 15, 1942, at about 11:25 P. M., in a building located at 511 Sycamore Street, Cincinnati, Ohio, which was occupied exclusively by the plaintiff as Lessee. The building was three stories in height and of reinforced concrete 'construction. The explosion was of such tremendous force that it drove the two elevators to the top of the building, knocked out the pent house located at the top of the shafts and caused the reinforced concrete floors which were six inches thick, to be blown upwards; the steel reinforced rods in the sidewalk were broken loose at the building line and the sidewalk was brought upward and outward into the street. Five persons who were in and about the building at the time were killed. Four of them were dead at the time their bodies were found and the fifth victim survived for a period of about twenty-four hours. Personal property of the plaintiff located in the building was damaged to the extent of more than $26,000.00.

Suit was brought to recover this damage which plaintiff claims was caused by the negligence of defendant in permitting large quantities of gas to escape from its mains and service pipes into the building.

Defendant denied the allegations of negligence and upon trial offered evidence tending to show that the explosion was not caused by escaping gas but was the result of the ignition of vaporized gasoline which had leaked into the basement from a gasoline dispensing unit maintained by plaintiff on the ground floor of the building. The point of the explosion was in the basement under the sidewalk.

Plaintiff's principal assignments of error relate to its claims that the trial court erred in the admission of evidence offered by the defendant as part of the res gestae, and in the rejection of rebuttal testimony offered by plaintiff under the same doctrine.

The trial court admitted, as part of the res gestae testimony of witnesses for the defendant, statements made by two persons who died as a result of the explosion. One of such persons, the declarant, Bass, was killed instantly and his statement received in evidence was made immediately before the explosion occurred. The other declarant, Bottorf, sur-

vived the explosion for about twenty-four hours and his statement to the witness, Schaefer, also received as part of the res gestae was made between eight or ten minutes after the explosion. The trial court rejected that part of the testimony of plaintiff's rebuttal witness, Officer Pogendick, which related to statements allegedly made by Bottorf a few minutes after the declarant's statements to the defendant's witness, Schaefer. The voluminous record of the trial contains much factual and opinion evidence in support of the conflicting claims on either side of the crucial issue, whether the explosion was caused by escaping gas or resulted from vaporized gasoline. However, reference will be made herein only to those evidential facts that form the context of the declarations admitted by the trial court as part of the res gestae and illustrate the circumstances under which the declarations proffered in rebuttal thereof were made.

At 11:22 on the night of July 15, 1942, the Fire Department of Cincinnati received a telephone complaint involving a condition at plaintiff's building. The fireman who received this call, relayed it to the police broadcasting station from which a police cruiser was dispatched to the Hodge Drive It Yourself building. In the police cruiser were Sergeant Hille and Officer Kasselman. As the cruiser approached plaintiff's building it traveled northerly on Sycamore Street to a point immediately north of the building where it was turned in a westerly direction over the sidewalk to the entrance of a parking lot. As the cruiser came upon the west sidewalk of Sycamore Street immediately north of plaintiff's building, Bass who had been in the building, approached the cruiser and spoke to the police officers. Immediately thereafter Sergeant Hille left the cruiser and accompanied Bass on foot to the entrance of the building about twenty feet away. Officer Kasselman who remained in the cruiser started to back into the street intending to park in front of the building. As Sergeant Hille and Bass reached the entrance to the building, and Kasselman was backing the cruiser into the street, the explosion occurred. Sergeant Hille's body was catapulted over a four-story building on the opposite side of Sycamore Street. He was killed instantly as was Bass, whose body was found in the school yard on the east side of Sycamore Street. Officer Kasselman was unhurt and appeared as a witness for the defendant.

The court permitted Kasselman to testify that as Bass came to the police cruiser a few moments before the explosion, he said "He was the one who called." The remainder of Bass's statements as reported by Kasselman is that:—

"He told us there was gasoline leaking in the basement in the garage and he says 'there might be a fire.' "

Schaefer who also appeared as a witness on behalf of defendant, testified that he was a pharmacist of long experience; that on the night in question he was returning home on a bus from his place of employment and when the bus reached the corner of Main and Fifth Streets which is one block north of Sycamore and Fifth Streets, the explosion occurred throwing the passengers on the bus into a state of panic; that the driver of the bus opened the doors; that Schaefer then ran east on Fifth Street to the corner of Sycamore Street where he came upon a man lying in the gutter. Schaefer described the man as having no clothes on excepting his belt and "a strip of clothing around his waist." The hair on his head and his eyebrows were blown off. His body was covered with a white coating of concrete powder and he had a severe cut on one of his legs. According to Schaefer, the man tried to rise and asked the witness to call his folks and tell them what happened. He gave his name as Kenneth Bottorf. Schaeffer stated that he administered first aid to Bottorf and bandaged his leg and that a bystander wrote Bottorf's name and address with a pencil given to him by Schaefer. In response to Schaefer's question, "What happened?" Bottorf said:

"That he was returning his car which he had rented and somebody was backing a truck or machine in there and had knocked the pump over and there was gasoline leaking someplace around there and then the whole thing let go."

Schaefer estimated that about three minutes elapsed from the time he heard the explosion until his arrival at the place where he found Bottorf lying in the gutter and that about five minutes or more elapsed after that before the above quoted statement was made.

Before the reception of Bottorf's statement, the trial court and counsel examined Schaefer at length in the absence of the jury. The record discloses that the trial judge made a careful, exhaustive and painstaking effort to ascertain all of the circumstances under which this statement of Bottorf was made. Bottorf was taken to a hospital and upon arrival there about 11:38 P. M., was found to be in a state of shock. Except for the opinion evidence of the witnesses who arrived on the scene after the explosion, the statement of Bottorf as testified to by Schaefer is the only evidence that indicated that

the gasoline dispensing unit was damaged prior to the explosion. It also tends to elucidate and explain the statement of Bass made immediately before the explosion.

In rebuttal. plaintiff offered Officer Pogendick as a witness. He testified that he and Officer Wehberg arrived at the corner of Sycamore and Fifth Streets, in a police ambulance, a short time after the explosion; that they put Bottorf upon a stretcher and placed him in the ambulance; immediately thereafter the two officers crossed the street, obtained the body of Bass which was also placed in the Ambulance; as the ambulance started for the hospital Bottorf said to the witness, Pogendick, who was in the back of the ambulance. "What happened? Where is my buddy?" Whereupon Pogendick said to Bottorf "What happened?" Bottorf responded, "I don't know." The statements of Bottorf as made to Pogendick on the way to the hospital were excluded by the trial court but proffered by plaintiff in rebuttal of testimony given by Schaefer.

The term 'res gestae' as presently employed in legal terminology describes a doctrine of the law of evidence that includes those exceptions to the rule against hearsay not otherwise classified which relate to declarations or acts concomitant to the fact at issue and which tend to illustrate or explain it. Perhaps on no other doctrine of procedural law have text writers and legal commentators written so profusely and so critically. Almost without exception they inveigh against the judicial practice of including within the broad and ill-defined outlines of the term 'res gestae' those exceptions to the hearsay rule that rest upon other principles capable of exact and accurate definition.

Professor Wigmore denounces the practice in the following vigorous language:

"The phrase 'res gestae' has long been not only entirely useless, but even positively harmful. It is useless, because every rule of Evidence to which it has ever been applied exists as a part of some other well established principle and can be explained in the terms of that principle. It is harmful, because by its ambiguity it invites the confusion of one rule with another and thus creates uncertainty as to the limitations of both. It ought, therefore, wholly to be repudiated as a vicious element in our legal phraseology. No rule of Evidence can be created or applied by the mere muttering of a shibboleth. Even if there were no accepted name for one or another doctrine, any name would be preferable to an

empty phrase so encouraging to looseness of thinking and uncertainty of decision." **Wigmore on Evidence, 3rd Edition, Vol. 6 page 182, Sec. 1767.**

Jones in his **Commentaries on Evidence, (2d Ed) Vol. 3 page 2187, Sec. 1193,** voices the same criticism in more moderate terms. He says:

"The subject of this chapter is one which has always been regarded as peculiarly vague, and the very haze in which it is enveloped has proved self-multiplying to such an extent that some authors see fit to avoid almost entirely the use of the term 'res gestae' and to disregard the language of courts which cling thereto by reclassifying all such matter under various exceptions to the hearsay rule."

The phrase "res gestae" meaning "things done" was originally employed in cases admitting verbal acts as exceptions to the hearsay rule. Its extension to include spontaneous utterances before and after the primary fact was accomplished with little regard for exactness or preciseness of definition. In the literature of decided cases the phrase has attained a significance that embraces a wide variety of acts and declarations occurring contemporaneously with or before or after the principal event to which they relate. As noted by the court in Landeau v. Travelers Ins. Co. 267 S. W. 376:

"Res gestae is a term of protean significance."

The strictures of commentators against the ill-considered use of the phrase do not extend to their finding fault with the actions taken by the courts. It is conceded that while "loose thinking" has impelled resort to this phrase to describe principles that ought more precisely to be defined, the decisions made on the admissibility of evidence generally have been sound. The broad compass of the doctrine as now understood is outlined by **Wharton** as quoted in **Jones' Commentaries** supra, **page 2189,** as follows:

"Those circumstances which are the undesigned incidents of a particular litigated act and which are admissible when illustrative of such act. These incidents may be separated from the act by a lapse of time more or less appreciable. They may consist of speeches of anyone concerned, whether participants or bystanders; they may comprise things left undone

as well as things done. Their sole distinguishing feature is, that they should be the necessary incidents of the litigated act; necessary in this sense that they are part of the immediate preparations for or emanations of such act, and are not produced by the calculated policy of the actors. In other words, they must stand in immediate causal relation to the act—a relation not broken by the interposition of voluntary individual wariness, seeking to manufacture evidence for itself. Incidents that are thus immediately and unconsciously associated with an act, whether such incidents are doings or declarations, become in this way evidence of the character of the act."

Under the doctrine of res gestae as thus defined, we have little difficulty in determining that the statement of Bass made to the police officers immediately before the explosion was properly received in evidence. This is true whether the statement be considered as a verbal act imparting color and significance to the actions of Bass and Sergeant Hille, or whether it be received as a spontaneous declaration made under the influence of impending danger. The declaration of Bass was almost synchronous with the explosion. It may be inferred fairly that less than a minute elapsed from the time of his statement to the police officers until Bass and Sergeant Hille reached the entrance to the building which was about twenty feet away. Bass' statement was not a narrative of a past transaction but was an urgent report of an existing condition and a forecast of possible disaster. It was made to police officers who had been sent to investigate a complaint. Both the content of the statement and the circumstance of its utterance bespeak the declarant's apprehension and fear and his disinterested purpose to prevent the threatened danger. The declaration was "immediately and unconsciously" associated with the primary fact.

In a case where the circumstances were less potent in their influence upon the mind of the declarant, the Supreme Court of Ohio held that a complaint made before the primary fact at issue and out of the presence and hearing of the plaintiff was properly admissible as part of the res gestae. **United Power Co. v. Matheny, 81 Oh St 204.** In that case the plaintiff sought to recover damages for his alleged wrongful ejectment from one of the defendant's street cars. As bearing upon the motive of the conductor in ejecting the plaintiff, the defendant offered evidence of statements made by other passengers who left the street car before plaintiff was ejected and which referred to plaintiff's alleged offensive

conduct. The trial court refused to admit this evidence but the Supreme Court held that the complaints made to the conductor by other passengers were part of the res gestae and that it was prejudicial error on the part of the trial court to exclude them.

Other cases decided by the Supreme Court holding that statements made before the principal event were part of the res gestae are **L. S. & M. S. R. R. v. Herrick, 49 Oh St 25; Outland v. Industrial Commission, 136 Oh St 488.**

The determination whether Bottorf's statement to Schaefer was admissible is governed by the principle applicable to spontaneous statements and declarations. The general principle which governs this exception is outlined by Jones in Vol. 3 (2d. Ed.) pages 2207 and 2208:

"The present attitude of the courts, it may be said, is to regard primarily the circumstances. Although it appears that the particular declarations, exclamations or statements were made after the occurrence in question, if it also appears that the principal occurrence was such as would be likely to cause more than passing mental effect and that the conduct of declarant was such as to show that its effect still continued as to him, and the declaration is relevant and relates to the occurrence, it is admissible."

The rule is more elaborately stated by Wigmore on Evidence at page 135, Vol. 6 (3rd Ed.) Sec. 1747:

"This general principle is based on the experience that, under certain external circumstances of physical shock, a stress of nervous excitement may be produced which stills the reflective faculties and removes their control, so that the utterance which then occurs is a spontaneous and sincere response to the actual sensations and perceptions already produced by the external shock. Since this utterance is made under the immediate and uncontrolled domination of the senses, and during the brief period when considerations of self-interest could not have been brought fully to bear by reasoned reflection, the utterance may be taken as particularly trustworthy (or at least as lacking the usual grounds of untrustworthiness) and thus as expressing the real tenor of the speaker's belief as to the facts just observed by him; and may therefore be received as testimony to those facts."

The earlier cases applied the principle that a spontaneous utterance to be admissible must be contemporaneous with the

principal event. This requirement has long since been abandoned by courts in all jurisdictions including Ohio. In **State v. Lasecki, 90 Oh St 10,** it was held that the limits of the doctrine of res gestae as applied to exclamations is not to be determined by the strict meaning of the word "contemporaneous" but by the "causal, logical and psychological relation to such exclamation with the primary facts in controversy." See also: **N. Y. C. & St. L. Ry. v. Kovatch 120 Oh St 533.** This rule as to exclamations has been made applicable to spontaneous declarations and statements made subsequent to the primary fact. **Bake v. Industrial Comm. 135 Oh St 627; Stough v. Industrial Comm. 142 Oh St 446.** The first paragraph of the syllabus of the Stough case reads:

"1. A declaration or statement to be admissible as part of the res gestae is not required to be exactly simultaneous with the primary fact in controversy, but it must be a spontaneous or an impulsive declaration or statement and not the mere narration of a past transaction."

In the opinion in the Stough case, the last above quoted statement from Wigmore is cited with approval. It may be assumed, therefore, that the principle that governs as to the admissibility of spontaneous utterances in other jurisdictions is applicable in Ohio. Applying this principle we hold that the statement of Bottorf to Schaefer was properly received in evidence.

Bottorf's declaration was made several minutes after the explosion but it is difficult to envisage a situation in which a declarant suffered a more serious or devastating shock to his nervous and physical system. The terrific force that destroyed the concrete building, stripped Bottorf of his clothing; removed the hair from his head and eyebrows; injured him in the leg and completely destroyed the normal functioning of his mental faculties. Instinctively he attempted to inform his family of the tragedy that had befallen him. As he was dissuaded in his feeble efforts to accomplish this purpose and was asked "what happened?" he impulsively made the statement of events that preceded the explosion. While the statement is narrative in form, it cannot be considered as a dispassionate utterance made as the result of "reasoned reflection." The circumstances under which Bottorf's statement was made, present a case where the mental effect of the shock of the explosion upon declarant was both serious and continuing. Under the circumstances of its utterance

the reliability and trustworthiness of the statement is assured. It meets every test of the admissibility of spontaneous declarations.

There remains for consideration the question whether the trial court erred in rejecting the proffered testimony of Officer Pogendick which was offered in rebuttal of Schaefer's testimony in respect of Bottorf's statement.

Plaintiff concedes that the answer of Bottorf to Pogendick's question "what happened?" is probably not admissible. Plaintiff, however, insists that Bottorf's exclamations "What happened? Where is my buddy?" were spontaneous and ought to have been received as tending to refute Schaefer's testimony that Bottorf had previously recounted the events he observd immediately prior to the explosion.

While it is arguable that Bottorf's exclamations in the presence of Officer Pogendick were the spontaneous utterances of a man in a severe state of shock, they do not tend to explain the primary fact at issue and thus lack that quality of illustration which is essential to any declaration admissible under the doctrine of res gestae. Manifestly these statements were inadmissible as evidence in chief on behalf of the plaintiff. To hold them admissible as evidence in rebuttal of a statement made a few minutes earlier by the same declarant would be to approve the novel proposition that hearsay evidence may be received to rebut testimony which was admitted under a recognized exception to the hearsay rule. This we cannot do.

Further, in view of Bottorf's tragically weakened condition and his fast ebbing vitality, it cannot be said that his later utterances to Officer Pogendick were necessarily inconsistent with the earlier statement made to Schaefer.

We do not find that the judgment is against the manifest weight of the evidence, nor do we find any prejudice resulting to the plaintiff by reason of the other assignments of error.

For the reasons hereinabove assigned the judgment of the Common Pleas Court is affirmed. Exceptions noted.

DOYLE, PJ, HURD, J, concur.