FRANCES ESTELLE CUMMINGS, Administratrix of the Estate of EVERETT LEE CUMMINGS, Deceased, Respondent, v. ILLINOIS CENTRAL RAILROAD COMPANY, a Corporation, Appellant, No. 43633—269 S. W. (2d) 111.

Division One, June 14, 1954.

*Watts & Gentry,* for appellant; *Joseph H. Wright* and *Herbert J. Deany* of counsel.

*Edward W. Fredrickson, William L. Mason, Jr.,* and *Koenig, Dietz & Mason* for respondent.

LOZIER, C.—Action under the Federal Employers' Liability Act, 45 USCA, Secs. 51-60. Plaintiff-respondent (herein called plaintiff) had a $71,250 verdict and, in compliance with the trial court's conditional order, remitted $10,250. Defendant-appellant (herein called defendant) appealed from the ensuing $61,000 judgment.

Defendant alleges error: In the overruling of its motions for a directed verdict; in the giving of an instruction; in the admission of certain evidence; and in the hearing, by the court out of the jury's presence, of certain testimony. Defendant also contends that the judgment is excessive.

Plaintiff alleged that her husband, Everett Lee Cummings, was fatally burned in defendant's "B" Yard in Marion County, Illinois, on January 22, 1951. In Paragraph 10, she alleged that Cummings sustained his injuries thus: When he "took an item of defendant's

equipment, to wit, a can or small drum containing gasoline from the 'shack' or shed within defendant's said yard * * * and used the contents or a portion of the contents thereof, to start or accelerate the burning of a fire, in the mistaken belief that the said can contained kerosene; whereupon the said gasoline exploded, enveloping the said Everett Lee Cummings in flame and causing his injuries and death as aforesaid.'' In Paragraph 13, plaintiff alleged that ''at the time of the casualty causing the death of plaintiff's husband, and for a long time prior thereto, it had been the custom of defendant to store and use kerosene only in and from plain cans or drums not painted red; to store and use gasoline only in and from cans or drums painted red; that her husband knew of such custom; that in reliance thereon he used contents of a can not painted red to start or accelerate a fire, in the belief that it contained kerosene; that the can contained gasoline, directly due to defendant's violation of the customs averred; that defendant also failed to warn her husband that the custom was not being followed, and that it had caused, allowed, and permitted the plain can to contain gasoline.''

Defendant's answer admitted that Cummings' death was the direct result of his injuries; and denied the allegations of Paragraphs 10 and 13 and that Cummings' injuries and death were caused by defendant's negligence.

About 6:30 or 6:35 on the morning of January 22, 1951, several of defendant's other employees heard screams and calls for help and ''saw a ball of fire roll out of the tool house.'' When they reached the scene, Cummings was lying on the ground. Several brooms in the shed were on fire and a five-gallon galvanized can, with its bottom partly blown out, was on the ground outside the shed. It was ''blacked and smoked,'' and had never been painted. None of them had ever seen it before that morning or knew where it came from.

All of Cummings' clothing, except a strip of his sweater on one arm, had been burned off and his entire body, except his head, face and hands, was severely burned. He was moaning and screaming with pain. They gave him a drink of water (for which he had asked) and covered him with an overcoat. He was ''rational'' and prayed to live long enough to see his wife and child again. Lynch heard Cummings say, ''Save me, boy, save me.'' Adams, yard superintendent, knelt down and prayed for him. Other than Piercy, no one heard Cummings say anything about what had happened. Over objection, Piercy testified that he heard Cummings say ''he got hold of the wrong can, he thought it was kerosene and it was gasoline.'' Piercy did not ''hear him say anything else as to how it happened.'' That was about 7 minutes after Cummings ran out of the shed, and about 15 minutes before the ambulance arrived.

En route to the hospital, Cummings asked the ambulance's owner if he thought he ''was going to make it'' and the owner told him, ''I thought he would. He just said he had a baby.'' They reached

the hospital shortly before or shortly after 7 a.m. Within 5 minutes, a Roman Catholic priest went to the emergency room, talked to Cummings for "a half hour or forty-five minutes, at least or maybe a little longer" and baptised him. Cummings "was rational and knew what he was talking about." In the priest's opinion, Cummings knew he was going to die, and "I think he wanted to prepare himself to meet his God." The priest did most of the talking "because we were trying to conserve the little strength he had. I performed my duties as any priest should. I talked to him and tried to encourage him and prepare himself. I think he knew at the time that he was going to die and I was trying to encourage him to prepare himself to meet his God." Nothing else was mentioned. Dr. Stevens, who treated Cummings, said that Cummings was "quite rational all the way through" (i.e. until he died at 1:32 that afternoon). The doctor did not tell Cummings how serious his condition was or of the possibility of his dying. Asked if Cummings believed or knew that "he was going to die," the doctor said, "Right at first, I don't believe he did."

About 8 a.m., just after the priest had left the emergency room, Deitz, defendant's dragline operator and Cummings' supervisor, entered the room and said to Cummings, "You'd better hurry up and get well, we have a lot of work to do. * * * He told me, 'Well, it will be quite a while.' He just said if the good Lord was willing, he was ready to go but he said he didn't think he would make it." Cummings asked Deitz if he (Deitz) had notified Mrs. Cummings and Dietz said he had. Over objection, Deitz testified: "Q. After that, did he say anything to you, or did you talk to him any at all about what had happened? A. Then I asked him how the accident happened. He told me to start a fire, he picked up the wrong can. I asked him what kind of can it was, if it was marked in any way. I asked him if it was painted red. He said no, it was just an ordinary can. * * * I asked him where he got the can. He said it was in a corner of the tool house."

The shed was on defendant's property, 1500 feet from any public road. The area was patrolled day and night by defendant's watchmen. The shed's doors were regularly kept locked. It was lighted by electricity. In it were a "caboose stove," a chair, a bench and a desk. Shovels and other maintenance tools were hung around the walls. Tracks ran through the shed and a track gasoline motorcar was regularly stored there at night by defendant's employee, Johnson, not a member of the maintenance crew which used the shed. No gasoline or kerosene were regularly "stored or kept" in the shed.

In cold weather, the practice was for the first man arriving in the morning to unlock the shed and make a fire in the stove. He made the fire out of kindling and coal, picked up in the yard by the men and kept in the shed. Asked "what was the customary method"

of starting the fire, Piercy, defendant's employee for 10 years, said, "Most of the time, it was started with waste paper, stuff like that, and greased waste out of boxes (that is, oily waste removed from journal boxes and thrown down in the yard). * * * Q. To your knowledge, was it customary for them, in starting a fire, at times to use kerosene to help get the fire going? A. Sometimes they did when it didn't start off just right." Jenkins, defendant's section hand "off and on" for 34 years, the last 22 years continuously, had "known people around the yards to use kerosene to get the fire going" throughout all those years.

In the opinion of plaintiff's expert witness, the explosion which blew out part of the bottom of the can and burned Cummings was caused by gasoline; and kerosene would not have exploded the can.

Plaintiff testified that Cummings left for work about 5 o'clock that morning; he had to drive 58 miles to work; he had no can with him when he left home; no gasoline was used around their home and no can, such as that in evidence (admittedly the one found outside the shed), was ever kept around the home.

A company rule required that all gasoline containers be painted red and that no gasoline be kept in other-than-red cans. There was no similar requirement as to kerosene containers.

Such was plaintiff's case as to defendant's liability. Defendant's witness Blessing, maintenance crew supervisor, testified that the reason for the red-cans-for-gasoline rule was to "warn employees." If he "saw a can there in the tool shed * * * ▆▆▆ that was not painted, and was not red, I would assume that it contained something other than gasoline. * * * You might find it (kerosene) in any kind of a can around there, * * * in fact, you might find it in a whiskey bottle * * * in jugs, or in gin bottles or in any kind of old cans."

▆▆▆ We first consider defendant's contention that its motions for a directed verdict should have been sustained because: "Without the statements made by Cummings as to how he was injured * * * there was no substantial evidence of any negligence of defendant as alleged in plaintiff's petition which caused or directly contributed to cause Cummings' fatal injury." Defendant argues: "In order to find that the can which was found blown up after the accident had been stored or kept with the gasoline in it in the shed, the jury had to guess * * * that the can was in the shed before the accident * * * and that appellant violated its own rule and custom * * * by storing gasoline in a can that was not painted red * * *."

To find defendant negligent in that respect, the jury did not have to indulge in "guesswork or speculation." As this is a Federal Employers' Liability Act case, negligence must be determined by principles established and applied by the Federal courts. Urie v. Thompson, 337 U. S. 163, 69 S. Ct. 1018, 1027 [14-16], 93 L. Ed. 1282. "It is

the clear congressional intent that, to the maximum extent proper, factual questions in actions arising under the Act should be left to the jury; * * * that the jury has the right to make all reasonable possible inferences from such probative facts in the evidence as the jury chooses to accept * * *." Malone v. Gardner, 362 Mo. 569, 242 S. W. 2d 516, 520[2, 3]. "Only when there is a complete absence of probative facts to support the" verdict, is an appellate court justified in reversing a judgment based upon the verdict. Lavender v. Kurn, 327 U. S. 645, 66 S. Ct. 740, 744[4-6], 90 L. Ed. 916, 923.

Plaintiff's evidence showed these facts: Defendant's red-cans-for-gasoline rule and practice; the explosion of gasoline in the unpainted, bottom-blasted can found outside the shed; the locked-at-night and guarded shed, to which only defendant's employees had keys; Cummings had not brought the can with him that morning. From which circumstantial evidence, the jury could most reasonably have inferred that the unpainted can, containing gasoline, was in the shed when Cummings arrived that morning, and that the can had been left or placed there by another employee of defendant. We rule that (without considering Cummings' statements to Piercy and Deitz) plaintiff made a submissible case as to defendant's negligence.

Defendant next contends that its motions for a directed verdict should have been sustained because defendant's negligence (violation of its red-cans-for-gasoline rule and practice) was not a proximate cause of Cummings' death; that the sole proximate cause was Cummings' violation of defendant's safety rule, "Inflammable liquids must not be used to start or intensify a fire." "The rule as to when a directed verdict * * * is proper is applicable to questions of proximate cause." Brady v. Southern Ry. Co., 320 U. S. 476, 64 S. Ct. 232, 88 L. Ed. 239, 244[5].

Defendant cites Wolfe v. Henwood (8th Cir.), 162 F. 2d 998, as "exactly in point on the question of proximate cause." However, in that case, Wolfe struck the match that ignited his glove, which he knew was gasoline soaked, and slapped the flaming glove on his trousers, which he knew were gasoline soaked. In the instant case, the jury could reasonably have inferred that Cummings did not know that the unpainted can, out of which he poured the liquid to start or accelerate the fire, was gasoline, that he was entitled to assume that the liquid was not gasoline and that he was not negligent in pouring the liquid out of the unpainted can. If the jury could so find, the jury could logically find that defendant's negligence was the proximate cause of Cummings' death.

Defendant argues that plaintiff failed to show a custom of using kerosene to start or intensify a fire; that Piercy's and Jenkins' testimony as to this matter (quoted above) "indicates that the use of kerosene was not customary but only occasional"; that "such oc-

casional incidents are wholly insufficient to show customary violation of the safety rule so that it may be said that the rule was waived.''

As between employer and employee, a custom ''need not be proven with such fullness as would make it a rule of common law. * * * The existence of a custom may be proved as any other fact. If there be substantial evidence tending to show the existence of the alleged custom, the issue is none the less submissible * * *.'' Young v. Terminal R. R. Assn. of St. Louis, (Mo.) 192 S. W. 2d 402, 404[1, 3].

In the instant case, the jury could have reasonably inferred from all of the evidence, that defendant knew or should have known that its employees in the yard customarily kept kerosene about the yard in unpainted cans and other containers and used it for starting or accelerating a fire. Defendant's witness Blessing, the maintenance section foreman, said ''you might find'' kerosene in any kind of a can or bottle in the yard. Plaintiff's witness Piercy (asked if it was ''customary for them in starting a fire, at times to use kerosene to help get the fire going'') said, ''Sometimes they did when it didn't start off just right.'' Plaintiff's witness Jenkins had ''known people around the yards to use kerosene to get the fire going'' for 34 years. Viewing this testimony in the light most favorable to plaintiff, we cannot say that, as a matter of law, plaintiff's evidence as to the issue was not substantial. Accordingly, the trial court properly submitted to the jury whether the use of kerosene in starting or accelerating a fire was a custom of which defendant had or should have had knowledge. Contrast Ottley v. St. Louis-San Francisco Ry. Co., 360 Mo. 1189, 232 S. W. 2d 966, 973-974[9], wherein there was no evidence whatsoever of customary violations of a safety rule with the defendant's knowledge and acquiescence, and the violations were not ''both so open and so continuous as to raise the presumption that the defendant knowingly consented.''

Defendant contends that plaintiff's Instruction No. 1 was erroneous in 3 particulars, viz.: (a) There was no substantial evidence tending to show the existence of the custom of defendant's employees to use kerosene in starting or accelerating fires ''under the same or similar circumstances as those shown in the evidence''; (b) there was no evidence whatsoever justifying the submission that Cummings obtained the can in the shed, that defendant, ''through its agents and servants, had caused the can'' to be in the shed and to contain gasoline; that ''defendant thereby violated'' its ''custom as to the handling of gasoline''; and that ''defendant was thereby negligent''; (c) the instruction authorized a plaintiff's verdict ''when there was no causal connection shown to have existed between the alleged negligence of defendant and the fatal accident of Cummings.'' Our hereinbefore discussion of the evidence, in ruling the submissibility of plaintiff's case, renders unnecessary consideration of these challenges to Instruction No. 1.

■ Defendant next contends that Cummings' statements to Piercy (that he "got hold of the wrong can, he thought it was kerosene and it was gasoline") and to Deitz ("he told me to start a fire, he picked up the wrong can," one "not painted red, * * * it was just an ordinary can * * *. He said it was in a corner of the tool house") were improperly admitted in evidence because they were "not parts of the res gestae."

No useful purpose will be served by discussing the many cases cited by the parties as to the admissibility of either statement. Whether a statement is admissible under "the res gestae rule" depends upon the particular circumstances; whether the statement is admissible under those circumstances is within the trial court's discretion; and the appellate court will not reverse the trial court's ruling unless it appears that that discretion was abused. Moore v. St. Louis Public Service Co., (Mo.) 251 S. W. 2d 38, 40[1,2].

■ " 'Res gestae' is a term of protean significance. It has been applied to so many different and unrelated situations that it has been said that 'the difficulty of formulating a description of "res gestae" which will serve for all cases seems insurmountable.' " Landau v. Travelers' Ins. Co., 305 Mo. 563, 267 S. W. 376, 378[1,2]. And see 6 Wigmore On Evidence (3rd Ed.), Sec. 1745, p. 131. There are "at least two different kinds of statements which are received in evidence under the designation of Res Gestae"; some non-hearsay statements are admissible as "verbal acts" or parts of an "otherwise relevant act"; certain hearsay statements, called "spontaneous exclamations," are admissible as exceptions to the hearsay rule. Sconce v. Jones, 343 Mo. 362, 121 S. W. 2d 777, 781[1,2].

In the Sconce case, we quoted and applied this statement of the "spontaneous exclamations" exception (Wigmore On Evidence (3rd Ed.), Sec. 1747, p. 135) : "This general principle is based on the experience that, under certain external circumstances of physical shock, a stress of nervous excitement may be produced which stills the reflective faculties and removes their control, so that the utterance which then occurs is a spontaneous and sincere response to the actual sensations and perceptions already produced by the external shock. Since this utterance is made under the immediate and uncontrolled domination of the senses, and during the brief period when considerations of self-interest could not have been brought fully to bear by reasoned reflection, the utterance may be taken as particularly trustworthy (or, at least, as lacking the usual grounds of untrustworthiness), and thus as expressing the real tenor of the speaker's belief as to the facts just observed by him; and may therefore be received as testimony to those facts." 121 S. W. 2d l.c. 781[3].

We need not decide whether Cummings' statement to Piercy was a "verbal act." This, because the statement was clearly admissible under the spontaneous exclamations" exception to the hearsay rule, "which

under certain circumstances permits testimony as to statements, made by a person involved in or present at an accident, declaring the circumstances of an injury at or after its occurrence. * * * The essential test of this class of statements is spontaneity. The lapse of time involved is material mainly as evidence of lack of spontaneity. * * * Certainly the true test is neither the time nor the place of a statement but whether it is a spontaneous statement produced by the event itself." Sconce v. Jones, supra, 121 S. W. 2d l.c. 781[1,2]. See Anno. 163 A.L.R. 15, 92. We need only to emphasize these circumstances under which the statement was made, viz.: Within 7 minutes after the explosion, when Cummings was suffering from intense burns over most of his body, screaming in pain, pleading with his fellow employees to "save me," praying that he might live long enough to see his wife and child again, and asking Adams to pray for him. Believing that such circumstances were substantial evidence of spontaneity, we rule that the trial court did not abuse its discretion in admitting the statement as a "spontaneous exclamation." Compare Hodge Drive-It-Yourself v. Cincinnati Gas & Elec. Co., 90 Ohio App. 77, 96 N. E. 2d 325; Roach v. Kansas City Public Service Co., (Mo.) 141 S. W. 2d 800, 804[10].

■ There is no merit in defendant's contention that "Cummings could not have stated other than a conclusion in making that statement. We do not mean to say or insinuate that he lied. We do not believe he intentionally falsified." Defendant argues thus: Cummings did not *know* the liquid in the unpainted can was gasoline because "he certainly would not knowingly have poured gasoline on the fire. He said he thought it was coal oil. After he poured the liquid, the explosion occurred immediately and he had no opportunity to observe what had been in the can. His only reason for saying it was gasoline was the fact it exploded, which he did not believe coal oil would have done, else he would not have attempted to pour coal oil on the fire." However, it does not follow that Cummings' post-explosion statement that "it was gasoline" was ■ a conclusion. Logically based upon the fact of the explosion itself, the statement was one of fact, a fact corroborated by plaintiff's other evidence that the liquid *was* gasoline and that kerosene would not have exploded. "Clearly, this was a statement of a fact, which the person making it had full opportunity to observe, and not a conclusion of fact reached by reasoning from other facts." Sconce v. Jones, supra, 121 S. W. 2d l.c. 781[3].

■ However, defendant's contention that the trial court erred in admitting Cummings' statement to Deitz must be sustained. The statement ("he told me to start a fire, he picked up the wrong can, one not painted red * * * it was just an ordinary can. * * * He said it was in a corner of the tool house") was clearly not a "spontaneous" one. It was made in response to Deitz' questions, about one and one-half hours after the explosion and almost that long after Cummings' spontaneous statement to Piercy. Prior to making the statement: Cum-

mings lay in the Yard for about 15 minutes after the explosion, prayed to live long enough to see his wife and child again, prayed for himself and asked Adams to pray for him and made the spontaneous statement to Piercy. En route to the hospital, Cummings conversed with the ambulance owner but said nothing about how the accident happened. Shortly after Cummings was taken to the hospital emergency room, the priest arrived and was with him "a half hour or forty-five minutes at least," baptised him and helped him prepare to meet his Maker. At all times after the explosion, Cummings was conscious and rational, and at the time he made the statement to Deitz, "knew what he was talking about" (the testimony of the priest who left the emergency room just before Deitz entered it.)

Plaintiff argues that from the time Cummings "made his first statement about getting hold of the wrong can, until he said where he got it, his consciousness was entirely taken up with—and indeed positively directed to—such matters as his chance for life, his baby, his God and preparation to meet his God." However, "spontaneity" hinges, not upon a determination of whether the declarant *in fact* did reflect or whether *in fact* his statement was prompted by self-interest, but upon whether the statement was "produced by the event itself." Instant plaintiff's evidence failed to show that Cummings "was under such influence of shock or pain as to be unable to reflect or reason after the accident so that these statements would be, when made, spontaneous utterance of thoughts created by or springing out of the event itself * * *." Sconce v. Jones, supra, 121 S. W. 2d l.c. 782[4-6]. We believe and hold that plaintiff failed to sustain her burden of showing the spontaneity of Cummings' statement to Deitz. Sconce v. Jones, supra, 121 S. W. 2d l.c. 782[4-6].

■ Plaintiff argues that Cummings' statement to Deitz was a "dying declaration," and that dying declarations should be admissible in civil cases. In Brownell v. The Pacific Railroad Co., 47 Mo. 239, 244, this court said of a statement (otherwise admissible as a spontaneous exclamation) : "As a dying declaration it was clearly inadmissible, for the modern decisions clearly establish the doctrine that the rule permitting dying declarations to be given in evidence applies exclusively to criminal prosecutions for felonious homicides, and has no reference to civil cases." Unquestionably, such is the rule in most jurisdictions. In some states, dying declarations are admitted in abortion and similar cases—in some instances (as in Missouri), under express statutes; in others, the declarations are admissible by statute in either criminal and civil cases generally or in civil cases involving death.[1] The Supreme Court of Kansas has held dying declarations admissible in civil cases

[1]See 31 C. J. S., Evidence, Sec. 238, p. 987; 20 Am. Jur., Evidence, Sec. 611, p. 523; 5 Wigmore On Evidence (3rd Ed.), Sec. 1432, p. 221; Annos. 91 A. L. R. 560, 49 A.L.R. 1282; Mercep v. State Industrial Accident Commission, 167 Ore. 460, 118 P. 2d 1061, 1064[1, 2].

880

generally. Thurston v. Fritz, 91 Kan. 468, 138 P. 625, 50 LRA
(NS) 1167, Ann. Cas. 1915D 212; Vassar v. Swift & Co., 106 Kan.
836, 189 P. 943.

"The rule which restricts this kind of evidence to prosecutions for
homicide has been vigorously attacked and stoutly defended. Un-
doubtedly it creates an anomalous situation giving legitimate rise to
this query: If the declaration of a dying man is of value in a homi-
cide cause, where another man's life is in .jeopardy, why is it not
equally admissible in all cases, civil and criminal?" 10 Boston Univ.
Law Review 470.[2] In 5 Wigmore On Evidence (3rd Ed.), Sec. 1436,
p. 229, it is said that the limitations (on the admissibility of dying
declarations to homicide cases) "are heresies of the last century, which
have not even the sanction of antiquity. They should be wholly
abolished by legislation."

Logically, it would seem that the admissibility of a dying declaration
should not hinge upon the type of case in which it is offered in evi-
dence. But it may be that the common law "heretical" limitation has
operated as a salutory check upon the "dying declarations" exception
itself—an exception reluctantly made by the courts, an exception the
basis for which courts are not in agreement (see 2 Mo. Law Review
281), and an exception which most courts apply with great caution.
Perhaps the limitation was but a refusal (albeit an illogical refusal)
to extend what might be said to be an unsound exception to the hear-
say rule. In other words, it may be that the illogical insistence of
courts that the use of dying declarations be limited to homicide cases
results from their natural disinclination to approve departures from
the basic general rule excluding hearsay testimony. See 16 Va. Law Re-
view 825.

So, the extension of the "dying declarations" exception approved
in Thurston v. Fritz, supra, may be, theoretically, the better rule. (But
see Blair v. Rogers, 185 Okla. 63, 89 P. 2d 928). However (assuming
without deciding that Cummings' statement to Deitz was a "dying dec-
laration"), we have concluded that the Brownell case should be fol-
lowed, not overruled. In the Thurston case, it was the view of the dis-
senting judge that any changes in the common law rule should be made
by the legislature, not by the courts. "It would seem, therefore, that
the adoption of this new rule of evidence [i.e., that of the Thurston
case], so sweeping, and of such debatable expediency should be left to
the consideration of the legislature." 27 Harvard Law Review 739,
741. In Blair v. Rogers, supra, 89 P. 2d l.c. 929, 932[1,2] (wherein the

---

[2]See also: Annos. 91 A.L.R. 560; 49 A.L.R. 1282; 41 Amer. Law Review
660; 27 Harvard Law Review 739; 9 Oregon Law Review 174; 2 Mo. Law
Review 201; 14 Mo. Law Review 318; 4 Kansas City Law Review 99; 16 Va.
Law Review 825; 10 Neb. Law Bull. 481; 12 Univ. of Cinn. Law Review 570;
14 Univ. of Cinn. Law Review 449; 6 Conn. Bar Journal 207, 210; Ross v.
Cooper, 38 N. D. 679, 164 N. W. 679, 686 (dissenting opinion).

court discussed and refused to follow the Thurston case), it was pointed out that statutory extensions of the "dying declarations" exception "became significant in the light of the criticisms of the general rule made by Professor Wigmore"; that, while Wigmore "attacks the general rule which excludes such declarations in civil actions as being based upon dubious authority and as entirely lacking in logic to support it or to differentiate it from the rule in homicide cases, he nevertheless suggests that changes be accomplished by legislative action rather than by judicial fiat. This suggestion takes on added weight when the numerous kinds of actions in which such declarations would be admissible in civil actions, if the general rule is rejected, are contrasted with the limited type of actions wherein such are admitted in Arkansas, Massachusetts and North Carolina [in which states there are statutes relating to the matter]. We observe that the general rule with respect to criminal cases is that such declarations are admissible in homicide cases only, and Professor Wigmore's stands against this rule as strongly as against the rule with respect to civil actions. We agree with him that if another rule is to be adopted, the legislature should provide for it."

The Brownell case was decided in 1871. In 1907, the legislature enacted the statute (now Sec. 546.310 RSMo 1949, V.A.M.S.) making dying declarations of the deceased woman admissible in prosecutions for abortion and similar offenses. (It is of interest that our statute requires corroboration of the declaration. Similar statutes in the other jurisdictions do not require corroborative evidence.) In the other six jurisdictions[3] which make admissible dying declarations in abortion and similar cases, the courts have made no other extensions of the common law (or the Brownell case) "dying declarations" exception to the hearsay rule.

Sec. 11.10 of the proposed Missouri Evidence Code would make a dying declaration admissible "in civil and criminal trials and proceedings to the same extent and for the same purposes that it would have been admissible had the deceased survived and been sworn as a witness in such trial or proceeding, but under the following restrictions: At the time of the making of such declaration the declarant was of sound mind, was conscious of approaching death and believed that there was no hope for recovery; and that such declaration was made voluntarily and not in answer to interrogatories calculated to lead the deceased to make any particular statement." (See 14 Mo. Law Review 318.) The Evidence Code, prepared in 1948, was introduced in two, and possibly three, successive sessions of the Missouri General

---

[3]Sec. 64, Ch. 233, Ann. Mass. Laws, 1932; Sec. 398-a, Am. Crim. Code, McKinney's Consol. Laws of N. Y.; Sec. 12412-1, Throckmorton's Ohio Code Ann., Baldwin's 1948 Revision; Sec. 583, 19 Purdon's Penna. Stats.; Sec. 34.3632, S. D. Code, 1939 (also admissible in rape cases); Sec. 8475, Vt. R. S. 1947.

Assembly. However, the legislature has not seen fit to enact any of its provisions. On the other hand, the legislature has made dying declarations admissible in abortion and similar cases. Thus, the legislature has seen fit to change the common law rule in one respect. In our view, if any other changes are to be effected—if dying declarations are to be made admissible in criminal cases other than homicide and abortion (and similar) cases, or in certain types of civil cases or in civil cases generally—such changes should be made by the legislature, the law-enacting branch of government, rather than by the judiciary, the law-interpreting branch.

Sec. 512.160, RSMo 1949, V.A.M.S., is in part: "No appellate court shall reverse any judgment, unless it believes that error was committed by the trial court against the appellant, and materially affecting the merits of the action." Plaintiff contends that Cummings' statement to Deitz was but cumulative testimony and that its admission was non-prejudicial to defendant. However, the statement was corroborative rather than cumulative; and we believe that the last part of the statement was so prejudicial as to require a remand of the case. See Hayes v. Kansas City Southern Ry. Co., (Mo.) 260 S. W. 2d 491, [4, 5], 496[6].

We are convinced that no prejudice resulted to defendant by the admission of the first part of the statement ("he told me to start a fire, he picked up the wrong can, one not painted red * * * it was just an ordinary can"). It was not disputed that the explosion occurred while Cummings was starting or accelerating a fire; defendant conceded that the unpainted can which exploded was the one found outside the shed that morning; and plaintiff's other evidence was that the can contained gasoline. We have held admissible Cummings' statement to Piercy that "he got hold of the wrong can, he thought it was kerosene and it was gasoline." Thus, the first part of Cummings' statement to Deitz was but corroboratory of plaintiff's other evidence that Cummings was starting a fire, picked up the wrong can, one not painted red.

However, we are convinced that the last part of Cummings' statement to Deitz (that the can "was in a corner of the tool house") was highly prejudicial. One of the most closely contested issues at the trial was whether the can was in the shed when Cummings arrived that morning. Both parties offered substantial circumstantial evidence from which it could have been reasonably inferred that Cummings did, or did not, bring the can with him that morning and that it had, or had not, been left in the shed by an employee of defendant other than Cummings, in violation of defendant's red-can-for-gasoline rule. The last part of Cummings' statement to Dietz was the only *direct* testimony that the can was there that morning when Cummings arrived. As, under such circumstances, the jury might

well have found the particular issue in plaintiff's favor because of that direct testimony, we cannot say that the effect of the admission of the last part of the statement was not prejudicial.

For the prejudicial error in the admission of the last part of Cummings' statement to Dietz, the judgment is reversed and the cause is remanded for a new trial. *Van Osdol* and *Coil, CC.*, concur.

PER CURIAM:—The foregoing opinion by LOZIER, C., is adopted as the opinion of the court. All the judges concur.