Ralph MEYERS and Olive Meyers, Respondents,

v.

Daryl Dean SMITH, Appellant.

No. 45494.

Supreme Court of Missouri,

Division No. 2.

April 8, 1957.

Roberts & Roberts, J. Richard Roberts, Farmington, for appellant.

Dearing, Richeson & Weier, Will B. Dearing, Hillsboro, Melvin Englehart, Fredericktown, for respondents.

BARRETT, Commissioner.

Ruth Meyers, aged fourteen years and nine months, died as the result of injuries sustained when the speeding automobile in which she was riding left the highway on a curve and crashed into a tree. Her father and mother, Ralph and Olive Meyers, have recovered a judgment for $15,000 for her negligent, wrongful death. The suit was instituted against Mr. Ralph Smith, the owner of the automobile, and his son, Daryl Dean ("Diz") Smith, sixteen years old, but before trial the action was dismissed as to the father and the judgment is against the appellant son, Diz.

Upon the trial of the case negligence in the operation of the automobile was virtually conceded; the decisive, litigated fact issue was whether, as the plaintiffs claimed, Diz was driving, or whether, as the defendant claimed, Ruth was driving when the automobile left the highway and crashed into the tree. It was the plaintiffs' contention that there were two boys, Diz and Harold Owens, and one girl, Ruth, in the front seat and that Diz was driving. It was the defendant's contention that there were two couples in the back seat, Diz and his date, Jerry Head, Paul ("Shot") Head and his date, Margarita ("Rita") Barker, and one couple, Harold Owens and his date, Ruth, in the front seat and that Ruth was driving.

The background circumstances were that on May 17, 1955, these six high school youngsters attended the Fredericktown Junior-Senior Prom. For the occasion Diz "borrowed" his father's 1953 four-door Ford automobile. He picked up his date, Jerry Head, and then picked up Rita and her date, Paul Head, and the four of them, Diz driving, attended the prom. There they met up with Ruth and her date, Harold Owens, and the six of them decided that they would leave the prom and "ride around a little while." Harold had his father's car but he and Ruth parked it on the outskirts of Fredericktown and got in the Smith automobile. They drove from Fredericktown to Farmington and, about eleven o'clock, were en route to Fredericktown again but by way of Ironton, on blacktop Highway W, when the automobile, traveling at a speed of sixty to sixty-five miles an hour, left the highway on a rather sharp curve and crashed into a tree. Two of the youngsters, Ruth and Harold, were pinned in the wreckage in the front seat, on the right-hand side where the cowl and door struck the tree. The other two couples were thrown from the automobile.

The plaintiffs proved by Diz' own admissions that he was driving the automobile when it crashed. A young man returning from "a date" stopped at the wreck and said that he asked Diz who was driving and Diz said, "I was driving the car." He inquired, "What happened?" and Diz said, "Coming around the curve and that was it."

A homeward bound fisherman stopped and Diz told him that he was driving; "He said he was coming around the curve, that his girl friend bumped his elbow, he lost control of the car and went off the road." While standing in a ditch alongside the highway he told one of the fisherman's companions that he was driving. A man who lived nearby said that he saw Diz in the hospital, in the hall crying, and "I said, 'Who done the driving?' He said, 'I done the driving.'" A highway patrolman talked to Diz at the hospital in Bonne Terre and Diz told the patrolman that he was driving; "He told me he was rounding the curve and in turning his elbow caught and he lost control of the car." In addition, Diz signed a statement for the collision insurance carrier's adjuster in which he stated that he was driving the automobile.

Upon the trial of the case Diz acknowledged having made the admissions, but he denied that they represented the truth. He and the surviving boys and girls stoutly maintained that the fact was that he was in the back seat with his date and that Ruth was driving when the automobile left the curve and crashed. He and the surviving boys and girls testified that after Harold and Ruth got in the automobile, on the outskirts of Fredericktown, Jerry, Diz' date, drove to the highway intersection at Farmington. Because Jerry, then fourteen years old, did not have a driver's license Diz drove through the city of Farmington and at the city limits he and Jerry got in the back seat with "Shot" Head and Rita and Harold and Ruth got in the front seat and, because he had formerly promised, Ruth, then almost fifteen years old, took over the driving and was driving when the automobile crashed into the tree. Immediately, before anyone came upon the scene, Diz said, "I remember dad told me not to let anybody drive, so remember I was driving the car." That was Harold's testimony; Diz testified, "I told all of the kids in the car with me to say I was driving the car. * * * My father told me very clearly when I left the house not to let no one drive and I knew she (Ruth) was under age and had no driver's license. I figured it wouldn't be so much trouble if I told them I was driving because I had (a) driver's license."

In addition to the admissions by Diz, the plaintiffs, in proof of their case in chief, called as witnesses the young man returning from his date, a neighbor lady who was visiting nearby, and the highway patrolman, and they all testified that the two surviving girls, Rita and Jerry, and possibly one of the boys, "Shot," all stated at one time or another that Diz was driving. Brooks, who had been to see his girl, came upon the wrecked automobile between, he said, 11:30 and 12:30; Mr. Crocker, the neighbor was there, and he may have been mistaken in that the fishermen may have driven up ahead of him. In any event Brooks took two girls, Rita and Jerry, and one boy, "Shot," in his pickup truck to the Neissen house nearby. On the way he asked the question, "Who was driving the car?" and one of the girls said, "The boy (meaning Diz) was driving the car. * * * Said the boy was driving the car." And the witness "believed" that she said there were three in the front seat and three in the back seat. Mrs. Crocker was visiting her brother, Mr. Neissen, when Mr. Brooks brought Rita and Jerry and "Shot" to the house, and she testified that, upon inquiry, Rita told her "there was three in the back seat and three in the front seat." The highway patrolman took Rita, Jerry and "Shot" to the hospital in Bonne Terre in his patrol car and, as he drove along, discussed the accident with them. The specific question by plaintiffs' counsel and the answer of the witness were: "Q. What did those two girls and that boy tell you while you were in that car leaving the scene of that accident as to who was driving that vehicle? A. They stated that Smith was driving."

When all of these questions were asked and the answers given on direct examination, defense counsel timely objected for the reasons that the questions called for hearsay testimony and the answers were hearsay evidence. The trial court was of

the view, however, that the testimony was "part of the res gestae" and, as indicated, admitted the testimony concerning the conversations in the course of the plaintiffs' case in chief. Thus, the essentially meritorious question upon this appeal is whether the trial court erroneously and prejudicially erred (V.A.M.S., § 512.160, subd. 2) in admitting in evidence either or all of these conversations upon the assumption that they were a part of the res gestae. The respondent says, "Such statements were admissible as a part of the res gestae exception to the hearsay rule of evidence."

For more than seventy-five years the distinguished legal scholars have repeatedly pointed out, with complete unanimity, the fallacies and unsoundness of res gestae as a rule of evidence, or as an exception to the hearsay rule which excludes proof of "extrajudicial utterances (only) when offered for a special purpose, namely, *as assertions to evidence the truth of the matter asserted.*" 6 Wigmore, Evidence, Sec. 1766, p. 178; McCormick, Evidence, Sec. 225, p. 460. Chronologically, some of the texts and articles analyzing and demonstrating the basic unsoundness of the phrase "res gestae" as a rule of evidence or as a figure of speech descriptive of an exception to the hearsay rule are: James B. Thayer, "Bedingfield's Case," 15 Am.L.R. 1 (1881); Edmund M. Morgan, "A Suggested Classification Of Utterances Admissible As Res Gestae," 31 Yale L.J. 229 (1922); Edward W. Hinton, "States Of Mind And The Hearsay Rule," 1 Univ.C.L.R. 394 (1934); 6 Wigmore, Evidence, Sec. 1767, p. 182 (1940); McCormick, Evidence, Sec. 274, pp. 585–587 (1954); Proposed "Uniform Rules of Evidence" Rules 62, 63(4) (1953). Nevertheless, Missouri's bench and bar, with rare notable exceptions such as Lewis v. Lowe & Campbell Athletic Goods Co., Mo., 247 S.W.2d 800, instead of candidly recognizing certain contemporaneous or spontaneous exclamations and utterances as a legitimate and basically sound exception to the hearsay rule (McCormick, Evidence, Sec. 272, pp. 578–579; 6 Wigmore, Evidence, Sec. 1745, p. 131), have stubbornly clung to the shibboleth of the meaningless Latin phrase. The most authoritative analysis and defense of res gestae as a rule of evidence, or as an exception to the rule excluding hearsay evidence, is contained in the exhaustive annotation, "Res Gestae Utterances In Actions Founded On Accidents," 163 A.L.R. 15–235 (1946). See also: 32 C.J.S., Evidence, §§ 403–421, pp. 19–54. But even the most convincing apologist for the doctrine is unable to reconcile even the leading Missouri cases, and vehemently objects to our attempts to combine Professor Wigmore's "shock test" with res gestae, particularly in connection with post-accident utterances. Annotation 163 A.L.R. loc. cit. 52–53, 90, 140, 156.

In connection with the doctrine in general, the respondent urges that "Trial courts are privileged to use reasonable discretion in determining whether hearsay testimony is admissible as a part of the res gestae exception to the hearsay rule of evidence," and that in this instance the trial court did not abuse its discretion. Billingsley v. Kansas City Public Service Co., 239 Mo. App. 440, 449, 191 S.W.2d 331, 334; Legger v. Great Northern Life Ins. Co., Mo.App., 216 S.W.2d 106, 109. But as the exponents of the rule have pointed out, particularly with respect to Missouri, such statements as "admissibility will be left in large measure to the discretion of the trial court" are but empty, hollow phrases. "No reliance can be placed on these decisions further than to say that the court can, if it wishes to, review the ruling without any concession to the trial court, but, if it wishes to, may review it cursorily and refer to the judge's discretion as a convenient resort, or a makeweight, or as a deciding factor where the evidence is obscure." 163 A.L.R., loc. cit. 94. It is the annotator's position that the trial judge is not the final arbiter, that whether evidence is admissible as res gestae is a question of law which the appellate court may and should pass on as it does any other mixed question of law and fact. Likewise, the annotator is critical of the so-called rule, which he stigmatizes as an "apology," that "each case rests on its own peculiar circumstances." 163 A.L.R. loc. cit. 184.

In addition to the rules of deference to discretion and the circumstances of the particular case, the respondent urges that "the true test is neither the time nor the place of a statement, but whether it was a spontaneous statement produced by the event itself." It is pointed out that witness Brooks arrived at the scene a short time after the crash, that the residence at which Mrs. Crocker was visiting was but a short distance away, that the information they obtained was in response to questions, and that the answers were not a narration of the events of the collision but were "statements * * * clearly and immediately connected with the main event, the collision of the automobile, (and) the serious injuries which would probably result in the death of at least one if not two of her friends." As to the statement made to the patrolman, it is said that "less than one hour" had elapsed, and it is urged "that the statements made by the occupants of defendant's automobile to the state patrolman, en route to the hospital, were merely an accumulation of what defendant admitted concerning the identity of the person who was driving when the wreck occurred." On the other hand, the appellant contends that the statements do not meet the tests of time, form, place, or condition of the declarants, and therefore were not admissible as a part of the res gestae. Sconce v. Jones, 343 Mo. 362, 121 S.W.2d 777.

It may be observed generally that the statements as testified to by Mr. Brooks, Mrs. Crocker and the highway patrolman were hearsay. 20 Am.Jur., Secs. 544, 589, pp. 460, 495. They were post-accident statements and they were employed testimonially, that is affirmatively to prove the truth of the matters asserted (31 Yale L.J., loc. cit. 230); that Diz, the defendant, was driving and that there were three people in the front seat and three in the back seat. Thus employed, as independent proof of the principal if not the only fact in issue, they were not merely cumulative evidence but corroborative evidence. Hayes v. Kansas City Southern Ry. Co., Mo., 260 S.W.2d 491, 495. The plaintiffs had the evidence of Diz' repeated admissions (20 Am.Jur.,

Sec. 544, p. 460), and the declarants, the two girls and the boy, were not unavailable as witnesses, or their evidence was not unobtainable, (Jerry and "Shot" were present and testified and Rita's deposition was used) and so the plaintiffs were not driven by the force of necessity to resort to hearsay evidence. McCormick, Evidence, Sec. 341, p. 627; 1 Univ.C.L.R., loc. cit. 415. Statements are not to be excluded merely because made in response to inquiry, but an answer to a direct question one hour after the occurrence affords considerable time for reflection and is some indication that it was not "spontaneous." Cummings v. Illinois Cent. R. Co., 364 Mo. 868, 269 S.W. 2d 111, 47 A.L.R.2d 513: The statement testified to by the patrolman was not "contemporaneous," and it does not appear that any of the statements were really excited "exclamatory utterances." McCormick, Evidence, Sec. 272, p. 578; Annotation 163 A.L.R., loc. cit. 92, 97.

In addition to the exhaustive annotation in 163 A.L.R., there are two other annotations on the subject of res gestae statements relating to the cause of, or responsibility for, automobile accidents, 76 A.L.R. 121 and 101 A.L.R. 1197, but we have been able to unearth but two cases dealing with statements by nondriving participants as to the fact of the identity of the driver. In one case, Shipp v. Davis, 25 Ala.App. 104, 141 So. 366, a drinking college student's automobile crashed into the rear end of a bus and as the boy sat behind the steering wheel with his two girl companions a bystander inquired who was driving and one of the girls replied that the defendant, Jack, was driving. The court carefully described the circumstances in which the statement was made, the crash had just occurred, bus passengers were scattered about on the pavement, the girl was injured and Jack was trying to quiet her, and "there was an air of general excitement still pervading the scene." As to the bystander's testimony the court said, "Anything said or done at that time tending to illustrate or give connection to the act is admissible as a part of the res gestae, and the court did not err in admitting such evidence, as

against the defendant Jack Shipp." The court, apparently, gave no force to the fact that Jack sat silently behind the wheel, heard the conversation, and made no response. In the other case, Zannelle v. Pettine, 51 R.I. 359, 155 A. 236, a father and mother sued for the death of their fourteen year old son who was killed when the truck in which he was riding collided with an automobile in a highway intersection. Colavecchio testified that he was driving the truck, that Minerella was seated next to him, and that plaintiffs' son sat on the extreme right of the seat and had nothing to do with the driving. The defendant, to destroy the plaintiffs' advantage of the boy's being a guest, offered to prove by Mr. McLean, who took the boys to the hospital in his automobile, that en route Minerella made the statement, " 'It is our fault; we had no business having this boy drive, he has no license.' " The defendant contended that the offer of proof was erroneously rejected because the statement was admissible as a part of the res gestae. In addition to pointing out that Minerella was available as a witness the court said, "Whenever the statement is used as testimony that the fact asserted in it did occur as asserted, it is being used testimonially and is within the prohibition of the hearsay rule. 3 Wigmore on Evidence, § 1746. Tested by these principles we find that the first part of the alleged statement of Minerella is an expression of his opinion and the latter part an assertion of fact. The statement is an abstract one and cannot be regarded in any sense as a spontaneous exclamation made at the time of the collision or in any way explaining how it occurred. To permit the defendant to use the statement as proof that Zannelle was driving the truck would violate the hearsay rule which prohibits the use of a statement made out of court as testimony to the truth of the fact asserted."

Mr. Brooks' testimony that "they" said "the boy was driving the car" and Mrs. Crocker's testimony that Rita said "there was three in the back seat and three in the front seat," standing alone and out of the context of the entire record, may not appear to be so patently prejudicial as to fairly demand the granting of a new trial. But the highway patrolman's testimony, in answer to an all inclusive question, that "They stated that Smith was driving," may not be viewed so lightly. Whether always worthy and justified or not, certainly perhaps with laymen, the testimony of a highway patrolman carries with it the force and weight of his exalted official position. The crucial and essentially meritorious question upon the entire trial, in fact the only debatable, determinative issue, was whether Diz was driving the automobile or whether Ruth was driving.

In considering prejudicial effect there is another view of all this evidence in addition to its being employed testimonially; its effect, undoubtedly, was to impeach the two girls and the boy, or their testimony, before they testified and regardless of what they might say. Paul Head, "Shot," testified that Ruth was driving but he was not asked and did not testify whether he had ever said that Diz was driving. He was asked, on cross-examination, whether he had ever told *Mrs. Nations* how they were seated, and he answered, "No, I don't think so. * * * I am not for sure." Jerry Head testified that Ruth was driving and on cross-examination was only asked whether she had told "this neighbor" that there were three in the front seat and three in the back seat. She answered, "I don't remember saying that. * * * I won't say that is not true, but I do not remember saying it." Rita, in her deposition, testified on direct examination that Ruth was driving. When asked whether "on the road home" she had told anyone who was driving she said, "I don't remember saying anything on the way home. * * * No, sir, I wouldn't testify either way, I don't remember." However, when asked whether she had ever told "anyone" that Diz was driving she replied, "Well, just anybody that asked me, anybody I talked to. * * * Daryl (Diz) thought it would be best and at the time I just figured it would

**480**

be the best thing to do." Plaintiff's counsel did not read her cross-examination.

It is our view, in conclusion, that the hearsay statements, particularly as testified to by the highway patrolman, do not plainly and demonstrably fit into the basic exceptions to the rule excluding hearsay evidence (McCormick, Evidence, Sec. 272, p. 583; 31 Yale L.J., loc. cit. 238–239), and, as indicated, were of such obvious prejudicial force as to demand the granting of a new trial. Cummings v. Illinois Cent. R. Co., supra; Sconce v. Jones, supra; Annotation 163 A.L.R., loc. cit. 92. Accordingly, the judgment is reversed and the cause remanded.

BOHLING and STOCKARD, CC., concur.

PER CURIAM.

The foregoing opinion by BARRETT, C., is adopted as the opinion of the Court.

EAGER, P. J., and STORCKMAN, J., concur.

LEEDY, J., concurs in result.